**STATE of Missouri, Respondent,**

v.

**Eugene Michael FLEER, Appellant.**

**No. 61174.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied
March 31, 1993.

Application to Transfer Denied
May 25, 1993.

Marsha Brady, Hillsboro, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

STEPHAN, Judge.

Eugene Michael Fleer ("Fleer") appeals his convictions, after a five-day jury trial, of two counts of first degree murder, § 565.020, RSMo.1986. We affirm.

The evidence, viewed in the light most favorable to the verdict, is as follows. In August 1986, Mari Kane ("Kane") lived at 200 Stillbrook Drive in Fenton, Jefferson County, Missouri, with her three and a half year old son, Tyler Winzen ("Tyler"). While Kane worked during the day, fifteen year old Stacy Price ("Price") babysat Tyler.

Steve Winzen ("Winzen"), Kane's ex-husband and Tyler's father, was not lawfully employed at this time. Rather, he earned his money selling drugs. His partner was Lester Howlett ("Howlett"). Howlett lived across the street from Kane's apartment. Kane considered Howlett her friend.

Kane had been caught shoplifting. As a result, she was required to attend "shoplifting classes" which were held on August 5–7, 1986. Kane wanted to be sure to get to the first class on time, so she asked Howlett to take her. Howlett agreed to do so. However, on the day of the first class, Howlett informed Kane that he would not be able to take her. He indicated that he had a friend, Fleer, who would be able to do so. Kane agreed to this arrangement. Kane further agreed that she and Fleer would use her car to get to the class.

At approximately 5:30 p.m. on August 5, 1986, Fleer arrived at Kane's apartment. Fleer, subsequently, drove Kane to the "shoplifting class" in her car. While Kane was in the class, Fleer had possession of Kane's car, car keys, and apartment key. After the class was over, Fleer picked up Kane, took her home, and gave her back her keys.

On the morning of August 7, 1986, Price arrived at Kane's apartment at approximately 6:55 a.m. Ten minutes later, Kane left for work, as Price lay on the couch, watching television, waiting for Tyler to awake.

At approximately 9:30 a.m., Neil Myrick ("Myrick"), who lived in an apartment at 201 Stillbrook Drive, woke up. He laid in bed for about twenty minutes and looked out his window. During those twenty minutes, he observed Fleer jogging in the rain. He also observed Fleer enter the building in which Kane and Tyler lived. He noted that Fleer remained in the building for approximately five minutes, thereafter exiting and going around the corner of the building.

At approximately 10:00 a.m., Price's mother, Judith Govereau, attempted to call Price. However, no one answered the phone. Govereau, therefore, asked her ten year old daughter, Rachel Nichols ("Nichols"), to go across the street and get Price. Nichols went across the street and knocked on the door. When no one answered, she returned home. Govereau told Nichols to return to the apartment because she believed that Nichols did not knock loudly enough. Nichols did so. Nichols rang the doorbell a few times. When she heard the phone ringing, she tried the door. Upon discovering the apartment unlocked, Nichols entered. Nichols looked around the apartment, but saw no one. She then

heard the bathroom door click, as if someone was locking the door. Nichols, who was scared, ran home and told Govereau.

Govereau got dressed and went over to the apartment. After getting no response from her knocks or the doorbell, Govereau entered the apartment. Govereau noticed that the bathroom door was closed. She noticed light coming from underneath the bathroom door, and she could hear the toilet running. She called Price's name, but nobody answered. Realizing something was wrong, Govereau returned home to get her boyfriend, Richard Pashia.

At approximately 10:40 a.m., Govereau woke Pashia up. He got up, got dressed and went to the apartment. Pashia checked the bathroom door and discovered that it was locked. He found a key above the bathroom door and unlocked that door. When he opened the door, he discovered the bodies of Tyler and Price in the bathtub. Pashia pulled Tyler out of the water. However, realizing that there was no chance of saving either child, he left the bathroom to prevent Govereau from entering. As Pashia comforted Govereau, he told the next-door neighbors to call the police.

At approximately this same time, Patricia Abegg drove past the Stillbrook apartment complex. Abegg, who had known Fleer for several years, saw Fleer leave the apartment complex. Although Fleer had a reputation for neatness, Abegg noticed that his hair was "messed up".

The assistant chief of the Springdale Fire Protection District, Russell E. Million, arrived on the scene at 11:09 a.m. A gentleman directed him to Kane's bathroom. Million saw Tyler in the bathtub, face up. As he reached in to grab Tyler, he noticed Price. He also noticed that the water was "very, very hot".

One of Kane's friends called her at work, told her something bad had happened and that she needed to come home. When she arrived, an officer informed her that both Tyler and Price were dead. Kane saw Howlett standing by the doorway of the apartment building. She went to him and tried to put her arms around him, but he

would not embrace her. He did, however, offer to call Winzen.

Later that day, Dr. Gordon L. Johnson, the chief medical examiner of Jefferson County, autopsied Tyler and Price. He concluded that Tyler died from drowning. He also concluded that Price died from drowning, in association with strangulation. He determined that the water which had been used to drown Tyler and Price was normal-temperature water, in that neither Tyler's nor Price's air passages were scorched.

That evening, Officers Thomas M. Moore and Michael Thompson interviewed Howlett. Howlett was "very nervous, very upset". When he broke down and started crying, the officers asked him if he would come back the next day and continue the interview. At approximately 10:30 p.m. the following day (Friday), Howlett asked Fleer to go to Rockford, Illinois to purchase cocaine. The two remained in Illinois overnight, returning to Fenton on Saturday. Upon their return, Howlett went to his apartment to pick up a scale. The two then went to Fleer's trailer to cut the cocaine.

At approximately 8:30 p.m., Fleer left his trailer to go to the Eders' home. When he returned to his trailer at approximately 11:00 p.m., he found Howlett dead, next to a package of cocaine. Fleer returned to the Eders' house. After making a phone call, he notified the Eders that they needed to call the police, since he had found Howlett dead in his trailer. Jeffrey Eder returned to Fleer's trailer with him. Jeffrey agreed to tell the police that he was with Fleer when Fleer found Howlett's body. After conducting an autopsy, Dr. Gordon determined that Howlett died from cocaine overdosage in association with heart problems.

On August 11, 1986, Officer William Baldwin interviewed Fleer. Fleer told Baldwin that he slept in his trailer the night before Tyler and Price were murdered. He also told Baldwin that although he went to Howlett's at approximately 11:30 a.m. on the day of the murders, he left the area shortly thereafter because

Howlett did not answer his door. Fleer additionally discussed Howlett's death with Baldwin. Initially, Fleer indicated that on Friday, August 8, 1986, he went to see Howlett and borrowed a motorcycle. Fleer subsequently said that he was mistaken and was really eating spaghetti with another friend. Finally, Fleer stated that the truth was that he went to Guy Youngman's house and ate spaghetti and watched movies. Then, about 9 p.m., Howlett came by with a man named Henry Garcia to pick up Winzen's motorcycle. About 10:30 p.m., Howlett called back and asked Fleer to go to Rockford, Illinois, to purchase cocaine. He stated that after they returned on Saturday, he went to the Eders at approximately 8:30 p.m. Finally, he stated that when he returned to his trailer at approximately 11:00 p.m. that night, he discovered Howlett's body lying next to a package of cocaine. Fleer admitted that he disposed of the cocaine and subsequently notified the police of Howlett's death.

Later that day, Tim McEntee, a lieutenant with the St. Louis Police Department, interviewed Fleer. McEntee told Fleer that a witness had placed him near the scene of the children's murders when the murders occurred. Fleer admitted that he lied when he made his previous statement. Fleer stated that the night preceding the children's murders, he and Howlett were at Howlett's apartment. He further stated that they drank, snorted cocaine, got high, and fell asleep. Fleer told McEntee that his next recollection was leaving the apartment complex in daylight hours in his car which was parked behind the murder scene. Fleer additionally told McEntee that he went to his trailer, cleaned himself up and returned to the apartment complex where he discussed the children's murders with a maintenance man.

During this interview, Fleer admitted that he had lied about the events in association with Howlett's death. Fleer told McEntee that after he discovered Howlett dead, he cleaned up the scene, disposing of various articles of cocaine paraphernalia. Finally, Fleer told McEntee that he went to the Eders' house and that he and Jeffrey Eder worked up a lie to tell the police.

Sometime after Tyler's and Price's deaths, Fleer moved in with Rod Conway. Fleer told Conway that he thought Tyler and Price were killed because a drug deal had gone sour. He also told Conway that: (1) Tyler was wearing pajamas when he was killed; (2) Price was watching television the morning of the murders; (3) there was no forced entry into Kane's apartment; (4) the killer must have killed the children with his bare hands and then placed them in the bathtub and run scalding hot water over them; (5) the killer put the children in hot water to remove fingerprints and impressions; (6) Price was beaten so badly that it looked like the esophagus in her neck was destroyed; and (7) the killer must have cleaned up the bathroom because there was no evidence.

Fleer also told Joan Boyer–Midgett that the children were killed because a drug deal had gone bad. Fleer told Boyer–Midgett that he and Howlett picked up some cocaine and that something was wrong with it. Fleer also told Boyer–Midgett that he and Howlett tried to contact Winzen since Winzen had given them the name of the man from whom they purchased the cocaine. Unsuccessful in locating Winzen, Fleer and Howlett continued to cut the cocaine. Fleer explained to Boyer–Midgett that they had a pile of pure cocaine and a pile of cocaine that had been cut. Fleer said that he went to get something to drink, and, when he returned, he found Howlett dead. Fleer told Boyer–Midgett that his theory was that the piles of cocaine had been switched and that Howlett ingested cocaine from the wrong pile.

In August 1986, Fleer told William Smith that he was incarcerated for killing two children and possession of drugs. Fleer also told Smith that his partner died of a drug overdose. Fleer explained that he was glad that his partner died because it "took the heat off him". Finally, Fleer told Smith that he was angry because he let the police take a pubic hair off of him and that the police would then be able to "pin it on him".

During the remainder of 1986 and 1987, Fleer told more than one person that he thought that: (1) the children were killed in retaliation for a rip-off drug deal; and (2) the children's bodies were placed in hot water to remove fingerprints.

On February 8, 1989, officers arrested Fleer for Tyler's and Price's murders. While being transported to Jefferson County, Fleer told Officer Richard Harris that: (1) he was aware that the case had been reopened; and (2) he knew that it was only a matter of time before law enforcement officers came after him.

While awaiting trial, Fleer was in prison with Ronald Eugene Boyer, Jr. In August 1989, Boyer overheard a conversation that Fleer was having with another inmate. During that conversation, Fleer admitted that he was guilty as charged. Boyer also overheard a telephone conversation during which Fleer stated that he would "get out of this any way that he could".

Fleer's case proceeded to trial on September 30, 1991. Fleer did not testify on his own behalf. At the close of all evidence, instructions and arguments of counsel, the jury found Fleer guilty of two counts of first degree murder. The jury recommended that Fleer serve two life sentences without eligibility for probation or parole. On November 15, 1991, the trial court imposed these recommended sentences. Fleer currently appeals. We will recite additional facts, as necessary, throughout the remainder of this opinion.

■ In his first two points, Fleer argues that the trial court abused its discretion by permitting the late endorsement of witnesses. Rule 23.01(f) governs the prosecutor's endorsement of witnesses. The rule provides, in pertinent part, that "[a]dditional witnesses may be listed at any time after notice to the defendant upon order of the court." Rule 23.01(f). The trial court possesses broad discretion in permitting late endorsement of witnesses. *State v. Sweet*, 796 S.W.2d 607, 613 (Mo. banc 1990). On review, we consider the following factors: (1) whether the defendant waived the objection; (2) whether the State intended surprise or acted deceptively or in bad faith, with intention to disadvantage; (3) whether, in fact, the defendant was surprised and suffered any disadvantage; and (4) whether the type of testimony given might readily have been contemplated. *Id.*

■ Fleer's first point is that the trial court abused its discretion by permitting the late endorsement of Ronald Eugene Boyer, Jr. Although the trial court ordered that all discovery be completed by August 1, 1991, for trial to begin on September 30, 1991, on September 30, 1991, the trial court granted the State leave to file a late endorsement of Boyer. Boyer testified on October 2, 1991. Boyer stated that he was in the Jefferson County jail in August 1989 during which time Fleer was also in jail. Boyer further testified that he overheard a conversation that Fleer was having with another inmate during which Fleer admitted that he was guilty as charged. Finally, Boyer testified that he overheard a telephone conversation during which Fleer stated that he would "get out of this any way he could".

Although Fleer did not waive his objection to Boyer's testimony, the State neither intended to surprise Fleer nor did it act deceptively or in bad faith with the intention to disadvantage Fleer. Moreover, Fleer was not surprised at Boyer's testimony. Instead, Fleer admits that the type of testimony given was readily contemplated. Finally, Fleer has failed to show that fundamental unfairness resulted from the trial court's decision to allow the State to endorse Boyer. Fleer's counsel cross-examined Boyer extensively. He impeached Boyer's testimony by forcing Boyer to admit that: (1) he waited over two years to come forward with this information; (2) he had been convicted of six felonies; (3) he made a deal with the State that he would testify in exchange for a favorable letter to the parole board; (4) he feared the penitentiary because he had been raped in there before; (5) he was having mental problems; and (6) he never inquired about who the person was to whom Fleer confessed. Fleer's contention is, therefore, without merit.

Before turning to Fleer's second point, we note that Fleer argues that he was severely disadvantaged by the State's late disclosure of certain information. Specifically, Fleer contends that the person to whom he allegedly confessed was Michael Shipley. However, the prosecutor failed to disclose that: (1) he instructed Lieutenant Robert Allen Depew of the Jefferson County Sheriff's Department to place Shipley, who was allegedly working for the State, in a cell with Fleer; and (2) Shipley never mentioned anything about the conversation which Boyer overheard. Fleer argues that these facts were relevant to impeach Boyer's testimony. Fleer additionally argues that defense counsel was not informed of these events until September 29, 1991, which was too late to obtain Depew's testimony at trial since Depew was out of the country.

Depew testified at Fleer's hearing on his motion for a new trial. Depew stated that on more than one occasion he had taken Shipley down to the detective bureau at the prosecutor's request and that the prosecutor, in fact, talked to Shipley. Depew also stated that the prosecutor requested that Shipley be placed in a cell with Fleer. Finally, Depew stated that defense counsel contacted him on September 29, 1991, at which time he related the instructions that the prosecutor had given him.

On cross-examination, Depew was impeached. He admitted that he was never privy to any of the conversations between the prosecutor and Shipley. Depew also admitted that he knew that Shipley was assisting the prosecutor in an unrelated case. Finally, Depew stated both that the defense counsel had paid him to serve some papers and that he had retained defense counsel in relation to some other matters. Given the substance of this cross-examination, we are unable to conclude that Depew's testimony or the discovery thereof would have affected the result of the trial. Fleer's first point is, therefore, denied.

■ Fleer's second point is that the trial court abused its discretion when it permitted that late endorsement of Dr. James McGiveny, a forensic odontologist. As pre-viously stated, the trial court ordered that all discovery be completed by August 1, 1991 for trial to begin on September 30, 1991. However, on September 17, 1991, the State endorsed McGiveny as a witness. On September 30, 1991, the trial court deferred its decision regarding whether it would allow McGiveny to testify. However, after the court heard Dr. Gordon Johnson's testimony, the court allowed the State to call McGiveny, who testified on October 1, 1991. McGiveny stated that marks found on Howlett's penis were not caused by human teeth. Fleer argues that this testimony was fundamentally unfair to him since he intended to argue that: (1) Howlett murdered Price after Price resisted his sexual advances, as evidenced by the clenched teeth marks on Howlett's penis; and (2) Howlett murdered Tyler because Tyler could have identified him.

Although Fleer did not waive his objection to Dr. McGiveny's testimony, he failed to show that the State intended surprise or acted deceptively or in bad faith with intention to disadvantage him. Moreover, Fleer has failed to show that he was surprised or that McGiveny's testimony might not have been contemplated. Since Fleer intended to argue that the marks on Howlett's penis were caused by Price's teeth, Fleer could expect that the State would attempt to foreclose this theory by presenting evidence which would negate this hypothesis. Moreover, we are unable to conclude that the admission of McGiveny's testimony resulted in fundamental unfairness to Fleer, for four reasons. First, defense counsel opened the door to rebuttal testimony regarding the marks on Howlett's penis when he asked Dr. Johnson: (1) whether the marks on Howlett's penis could be consistent with any number of things; (2) whether the marks were applied when Howlett had an erection; and (3) whether he had any means of telling what caused Howlett's wound. Second, defense counsel, apparently, did not depose McGiveny before trial. Third, defense counsel did not find a rebuttal witness, although they had thirteen days to do so. Fourth, defense counsel did not seek a continuance after having been notified that McGivney would testify.

For these reasons, Fleer's second point is denied.

Fleer's third point is that the trial court erred in refusing to grant defense counsel leave to produce a tape recorded statement to impeach Joan Boyer–Midgett's trial testimony with a prior inconsistent statement. We note, at the outset, that defense counsel read excerpts from a transcript of the tape recorded statement to the jury. The prosecutor then vouched for the accuracy of the partial transcript. When defense counsel asked Boyer–Midgett if she remembered her answer to one specific question, Boyer–Midgett stated that she did not. The trial court, thereafter, suggested that defense counsel allow Boyer–Midgett to read the transcript. Having done so, Boyer–Midgett stated that she still did not remember her answer. Defense then again asked leave to play the tape recording to the jury. In denying this request, the trial court stated that both the prosecution and defense counsel stipulated to the accuracy of the transcript statement. The trial court then offered to grant defense counsel leave to read the transcript statement to the jury for a second time. Defense counsel did so. Fleer, however, argues that in restricting counsel to reading the portion of the transcript in lieu of confronting Boyer–Midgett with her own voice, defense counsel's impeachment of Boyer–Midgett was less effective and the best evidence rule was violated.

■ Initially, we note that to preserve a claim of error in the reception of evidence, an accused must object with sufficient specificity to apprise the trial court of the grounds for the objection. *State v. Herrick*, 814 S.W.2d 660, 663 (Mo.App.1991). The grounds asserted on appeal are limited to those stated at trial. *Id.*

■ At trial, defense counsel made no contention that restricting counsel to reading the portion of the transcript in lieu of confronting Boyer–Midgett with her own voice either rendered the witness' impeachment less effective or that it violated the best evidence rule. An appellate court will not convict a trial court of error on an issue which was not put before it to decide. *Id.*

We will, however, review this point for plain error under Rule 30.20. Relief will be granted under the plain error rule only when the error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *Id.* The burden of demonstrating that the action of the trial court resulted in manifest injustice is allocated to the defendant. *State v. Thomas*, 791 S.W.2d 861, 862 (Mo.App.1990). We find no manifest injustice or miscarriage of justice here.

■ We addressed the best evidence rule in *State v. Trader Bobs, Inc.*, 768 S.W.2d 183, 187 (Mo.App.1989). In that case, we explained that the best evidence rule is activated when the terms of a writing are in dispute, in which case the original document is deemed to be the best evidence of the terms of the writing. *Id.* We further explained that two distinct rules are involved in determining the application of the best evidence rule; one relating to proof of what the instrument contains and the other relating to the probative effect of its recitals. *Id.* The best evidence rule applies only in the case of the former. *Id.* Where the contents of a writing are not directly in issue, although the evidence contained in the writing may bear upon a fundamental issue in the case, the best evidence rule does not apply and secondary evidence may be used without accounting for the original document. *Id.*

■ Turning to the case at bar, the best evidence rule applies to sound recordings as well as documents. *State v. Strothers*, 798 S.W.2d 723, 724 (Mo.App. 1990). Applying the principles enunciated above, where the contents of a sound recording are not directly in issue, although the evidence contained in the sound recording may bear upon a fundamental issue in the case, the best evidence rule does not apply and secondary evidence may be used without accounting for the original recording. Here, the contents of the tape recording are not directly in issue because both parties stipulated that the transcript excerpt accurately reflected the tape-recorded statement. Thus, the best evidence rule

did not apply and secondary evidence could be used without accounting for the original sound recording. The trial court, therefore, did not err in refusing to grant defense counsel leave to produce the tape recording. Fleer's third point is denied.

In Fleer's fourth point, he asserts that the trial court erred in three respects. We will address each contention separately.

■■■ Fleer's first contention is that the trial court erred in referring to Howlett's death as a murder. The complained of testimony is as follows:

Q. (BY DEFENSE COUNSEL TO MICHAEL HECK) Well, you talked to various people around concerning the matter yourself, didn't you?

A. Yes, I did.

Q. How many people can you think of during the say the first week after [Howlett] was, died, that you talked to—

[THE PROSECUTOR]: Object to that as relevancy.

Q. About the murder, how many people would you say?

THE COURT: Which, would you fix which murder now you're referring to.

[DEFENSE COUNSEL]: I said after [Howlett] died the first week.

THE COURT: You used the word murder. I didn't hear the last part of your question.

[DEFENSE COUNSEL]: Could I rephrase the question?

THE COURT: Yes, sir, please.

Q. After [Howlett] died, say within the following week, how many, about how many people did you talk to about these murders and [Howlett] dying?

At the outset, we note that defense counsel did not object to the trial court's use of the word "murder" at trial. Thus, this claim is only entitled to plain error review under Rule 30.20.

■■■ It is axiomatic that a trial judge must not indicate by his comments or questions his opinion of evidence in the case. *State v. Moseley*, 705 S.W.2d 613, 616 (Mo. App.1986). The standard for examining the conduct of the trial judge is whether the trial court's conduct is such as to preju-

dice the minds of the jury against defendant thereby depriving defendant of a fair and impartial trial. *State v. Thomas*, 791 S.W.2d 861, 862 (Mo.App.1990). A defendant is entitled to absolute impartiality by the trial judge. *Id.* There is no error as long as the trial judge does not express an opinion as to the nature, content or truthfulness of the evidence. *Id.*

Here, defense counsel specifically injected the use of the word "murder". The court then asked defense counsel to clarify the murder to which defense counsel was referring so that the court could rule on the prosecutor's relevancy objection. The trial judge did not express an opinion as to the nature, content or truthfulness of the evidence. Since the trial judge's conduct was not such as to prejudice the minds of the jury against Fleer thereby depriving him a fair and impartial trial, Fleer's contention is without merit.

■■■ Fleer's second contention is that the trial court erred in sustaining the State's objection to defense counsel's closing argument that Patricia Abegg clocked in at work at 10:45 a.m. Fleer argues that Abegg testified that she clocked in at 10:45. Fleer further argues that when the trial court sustained the State's objection, it in effect told the jury that defense counsel's recitation of Abegg's testimony was incorrect.

At the outset, we note that during closing argument, defense counsel argued that according to Abegg's testimony, she checked in at *exactly* 10:45. Defense counsel then stated: "[s]o we know that's pretty accurate, and they knew it was pretty accurate." The State then objected that defense counsel's comment was outside of the evidence since Abegg did not say that she clocked in at 10:45. The trial court, thereafter, sustained the State's objection.

■■■ The trial court has broad discretion in controlling the scope of counsel's closing arguments. *State v. Benton*, 812 S.W.2d 736, 740–741 (Mo.App.1991). This court will not reverse the trial court's ruling on the propriety of counsel's argument

unless there has been a clear abuse of discretion. *Id.*

Here, there has not been a clear abuse of discretion. Defense counsel argued that Abegg checked in at *exactly* 10:45. Defense counsel further argued that he knew that this testimony was pretty accurate. Abegg's testimony, however, was not as clear as defense counsel portrayed it. Abegg's actual testimony is as follows:

Q. [BY DEFENSE COUNSEL TO ABEGG]: Incidentally what time did you clock in that day?

A. 11:45. Oh, 11:45 to 11:47, somewhere around there. No. I'm sorry. 10:45. It was five minutes till 11.

Q. 10:45?

A. Right.

The above excerpt indicates that Abegg testified that she clocked in at four different times: (1) 11:45; (2) 11:45 to 11:47; (3) 10:45; and (4) five minutes until 11. Thus, the trial court did not err in determining that Abegg did not testify that she checked in at *exactly* 10:45. Fleer's contention is without merit.

Fleer's third contention is that the trial court erred in overruling his objection to the State's argument that on the day that Tyler and Price were murdered, Howlett received a collect phone call from Las Vegas at 10:26 St. Louis time. Again, the trial court is vested with broad discretion in controlling closing argument. *State v. Jacobs*, 813 S.W.2d 318, 322 (Mo.App. 1991). Wide latitude is accorded counsel in summation. *Id.* The prosecutor has the right to argue reasonable inferences from the evidence. *Id.* Additionally, he has the right to draw any inference from the evidence which he believes in good faith to be justified. *Id.* Improper argument is grounds for reversal only if it can be shown that the prosecutor's comments had a decisive effect on the jury. *State v. Keil*, 794 S.W.2d 289, 293 (Mo.App.1990).

State's exhibit 66 reveals that someone at Howlett's trailer accepted a collect phone call from Las Vegas at 10:26 a.m. on August 7, 1986. The phone bill does not specify whether this is 10:26 St. Louis time or 10:26 Las Vegas time. The prosecutor

could, therefore, in good faith, argue that the times listed on a person's phone bill reflect the time that the person received the call according to the receiver's time zone, rather than the time the call was transmitted according to the transmitter's time zone.

Moreover, Fleer failed to demonstrate that the prosecutor's comment had a decisive effect on the jury. This is because the State additionally argued that on August 7, 1986, Howlett made two calls from his trailer to Leasburg, Missouri; one at 10:14 a.m. and another at 10:37 a.m. These calls definitely reflect St. Louis time. Fleer's third contention is without merit. Fleer's fourth point, in total, is, therefore, denied.

In Fleer's fifth point, he presents two contentions. We address each separately.

Initially, Fleer argues that the trial court abused its discretion in conducting the trial in such a rapid manner. Defense counsel never objected to the pace of the trial during the trial. Thus, this claim is only entitled to plain error review under Rule 30.20.

A trial court has considerable discretion in determining when to grant a recess or temporary adjournment during a trial. *State v. Simpson*, 779 S.W.2d 274, 284 (Mo.App.1989). Such discretion will not be disturbed absent a showing of an abuse of that discretion. *Id.* There has been no such showing here. During Fleer's hearing on his motion for a new trial, the trial court noted:

I have never had a jury that was quite like the jury in this case, that the jury worked at their own pace, they never seemed to get particularly angry or disgruntled, they indicated when they wanted to take recesses. I do not believe that that jury was fatigued during their deliberations. They indicated that they wanted to go back to the hotel, take a night sleep, they did, came back, indicated when they wanted to take their meals, I was most impressed with this particular jury.

We agree with the trial court. Fleer's contention has no merit.

Fleer also contends that the trial court erred in denying him a new trial because a juror allegedly took inaccurate notes during recesses and shared them with other jurors. Specifically, Fleer contends that: (1) the use of the notes amounted to juror misconduct; and (2) since the jurors relied on these notes during their deliberations, this deprived him of the right to have his guilt or innocence decided upon a fair and due consideration of the evidence properly received at trial.

Prior to Fleer's hearing on his motion for a new trial, Fleer's counsel subpoenaed the jurors, who subsequently appeared at this hearing. In lieu of their testimony, defense counsel offered affidavits from the jurors. The trial court, however, refused to permit defense counsel to impeach the jury's verdict.

Missouri law has long held that a juror's testimony or affidavit may not be used to impeach the verdict as to misconduct inside or outside the jury room whether before or after the jury is discharged. *Stotts v. Meyer*, 822 S.W.2d 887, 889 (Mo. App.1991); *State v. Babb*, 680 S.W.2d 150, 152 (Mo. banc 1984). Thus, the trial court did not abuse its discretion in failing to grant Fleer's motion for a new trial.

Fleer's sixth point is that the trial court erred in refusing to allow testimony that although he had taken and passed a polygraph examination, he was told that he had not passed the test. Fleer contends that this evidence would have: (1) explained why he was concerned that authorities were trying to pin the murders on him; and (2) negated the inference that he frequently talked about the murders because he had a guilty conscience.

At trial, defense counsel made an offer of proof by eliciting the testimony of Officer Dennis McGuire out of the presence of the jury. McGuire testified that: (1) he administered a polygraph examination to Fleer; (2) Fleer denied any involvement in Tyler's and Price's murders; and (3) he felt that Fleer was being truthful with him. Although the court received the offer of proof, the court denied it. Defense counsel, thereafter, never presented evidence which would indicate that Fleer had been told that he failed the polygraph test.

When an objection is made to proffered evidence and that objection is sustained, the proponent must make an offer of proof in order to preserve the matter for appellate review. *State v. Bounds*, 785 S.W.2d 586, 590 (Mo.App.1990). An offer of proof must demonstrate the relevancy of the testimony offered, must be specific, and must be definite. *State v. Dagley*, 793 S.W.2d 420, 423 (Mo.App.1990). Usually, a proper offer of proof entails questions to a witness on the stand. *Id.* Here, McGuire did not testify that anyone told Fleer that he did not pass the polygraph examination. Moreover, defense counsel failed to represent that any individual would testify as such. Thus, defense counsel failed to show how McGuire's testimony was relevant.

Moreover, it is improper to admit evidence of the fact that polygraph tests have or have not been taken. *State v. Woods*, 639 S.W.2d 818, 820 (Mo.1982). The results of polygraph examinations, likewise, are inadmissible. *Id.* Thus, the trial court did not abuse its discretion in refusing to allow testimony that although Fleer had taken and passed a polygraph examination, he was told that he had not passed the test. Fleer's sixth point is, therefore, denied.

Fleer's seventh point is that the trial court erred in overruling his motion for a speedy trial. Fleer argues that his incarceration for two years and eight months prior to trial violated the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 18(a) of the Missouri Constitution.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to a speedy trial. *State v. White*, 706 S.W.2d 498, 501 (Mo.App. 1986). What may be a speedy trial in one instance may be deemed dilatory in another. *Id.* This amendment does not guarantee an instant trial, or a prompt trial. *Id.* No exact formula has been established in Missouri to measure and ascertain if a trial delay is presumptively prejudicial. *Id.*

Each case and its facts must be examined. *Id.*

Determining whether an accused has been denied his constitutional right to a speedy trial requires that we engage in a difficult and sensitive balancing process in which the conduct of both the prosecution and the accused is weighed. *State v. Bohannon*, 793 S.W.2d 497, 503 (Mo.App. 1990). Four factors are examined: (1) length of the delay; (2) reason for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) prejudice to the accused.

For purposes of constitutional analysis, the protection of the speedy trial provisions attach when there is a formal indictment or information or when actual restraints are imposed by arrest and holding to answer a criminal charge. *State v. Bohannon*, 793 S.W.2d at 503. In the case at bar, the trial court held a hearing on February 8, 1989. At that hearing, the State read an information which charged Fleer with two counts of first degree murder. The trial court denied any bond. Fleer was, thereafter, incarcerated. We, therefore, will assume that Fleer's constitutional right to a speedy trial accrued on February 8, 1989. Trial began on September 30, 1991. Thus, a total of more than thirty-one months passed from incarceration until trial. For our purposes, we can deem this delay presumptively prejudicial. *State v. Loewe*, 756 S.W.2d 177, 181 (Mo. App.1988).

As the reviewing court, we must look at the reasons given by the State for the delay. *Id.* We then determine whether the trial court could have reasonably decided the delay was or was not justified. *Id.* Different weight is given to different justifications. *Id.* at 182. A deliberate attempt to delay the trial in order to hamper the defense should be weighted against the government. *Id.* A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Id.* Finally, a valid reason, such as a missing witness, should serve to justify the delay. *Id.*

Here, Fleer's trial was set for January 22, 1990. However, it had to be delayed because summonses failed to reach prospective jurors. This factor must be weighed, although not heavily, against State.

Fleer's trial, thereafter, began on May 15, 1990. It, however, ended in a mistrial on May 21, 1990, after Winzen, Tyler's father, disregarded the assistant prosecutor's instruction not to mention that the first time he met Fleer, Fleer was beating a woman.

On May 25, 1990, the State moved to appoint independent counsel for Fleer on the basis of conflict of interest. Specifically, the State argued that defense counsel had previously represented George Taylor, one of its proposed witnesses. The State further argued that during the May 15, 1990 trial, defense counsel stated that if Taylor testified that in 1986 defense counsel told him not to come forward with the fact that Fleer had confessed that he had murdered Tyler and Price, defense counsel would deny that any such conversation took place.

On June 5, 1990, Fleer filed his demand for a speedy trial. On June 13, 1990, the trial court appointed independent counsel to represent Fleer. On July 30, 1990, the State filed a motion to disqualify defense counsel on the basis of defense counsel's conflict of interest. On September 20, 1990, the trial court ruled, that unless otherwise prohibited, it would enter an order removing defense counsel which would be effective on October 3, 1990. Fleer immediately filed a writ of prohibition with our court. We issued a preliminary order in prohibition on October 5, 1990, and a permanent writ on April 23, 1991. On May 16, 1991, we filed the mandate of our decision, thus indicating that the decision was final.

On June 10, 1991, Fleer filed a motion to dismiss and in the alternative to disqualify the prosecuting attorney's office. On August 6, 1991, the trial court overruled both

Fleer's motion to dismiss or in the alternative to disqualify the prosecuting attorney and Fleer's motion for a speedy trial. With regard to Fleer's motion for a speedy trial, the trial court specifically noted that the substantial delay was caused by Fleer's interlocutory appeal. Fleer's case, thereafter, proceeded to trial on September 30, 1991.

The above scenario indicates that almost a year passed during the resolution of the issue of whether it was appropriate for defense counsel to continue to represent Fleer. The ultimate responsibility for this delay must rest with the State rather than with Fleer. However, we do not weigh this factor heavily against the State. When a defendant resorts to an interlocutory appeal, he may not use it both as a sword and a shield. In other words, he may not demand relief but then contend that the relief that he demanded took too long and that he, therefore, should have his case dismissed for failure to receive a speedy trial.

Moreover, nothing in the record bespeaks of bad faith on the part of the prosecuting attorney. Certainly, there is no evidence of a deliberate attempt to delay the trial in order to hamper the defense. Thus, although the second factor is weighed against the State, it is not persuasive.

The third factor is whether, when and how a defendant asserts his right to a speedy trial. Here, Fleer filed his request for a speedy trial on June 5, 1990. By that time, some sixteen months had elapsed since his arrest. Fleer did not, therefore, immediately assert his right to a speedy trial. *See State v. Bohannon*, 793 S.W.2d 497, 504 (Mo.App.1990) (wherein the court determined that since the defendant allowed eleven months to elapse before asserting his right to a speedy trial, he had not immediately asserted his right). We, therefore, weigh this factor against Fleer, although not heavily.

■ The fourth factor we consider is prejudice to Fleer. The factors to be assessed in determining whether delay results in prejudice to the defendant are: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired. *State v. Bolin*, 643 S.W.2d 806, 815 (Mo. banc 1983). Undoubtedly, anxiety and concern exist in every criminal case. That alone, however, does not establish prejudice where, as here, the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances. *Id.*

We note that Fleer alleges that his defense was impaired because the delay caused lapses in memory. We have reviewed the trial transcript in its entirety. Fleer does not contend that any witness died or disappeared or was otherwise unavailable to him. Although loss of memory is not always reflected in the record because what has been forgotten can rarely be shown, our reading of the transcript reveals no substantial evidence of memory lapse on the part of the witnesses. *State v. Bolin*, 643 S.W.2d at 816. We, therefore, weigh this factor against Fleer; nothing indicates that he was prejudiced by the delay.

In balancing the four factors, we are not persuaded that Fleer's Sixth Amendment rights were infringed. Fleer's seventh point is, therefore, denied.

Fleer's eighth point is that the trial court erred in overruling his motion to dismiss after double jeopardy attached. Specifically, Fleer argues that he was goaded into requesting a mistrial during the May 16, 1990 trial after Winzen testified that the first time that he met Fleer, Fleer was beating a woman. Fleer argues that although: (1) the assistant prosecuting attorney instructed Winzen that he could not so testify; and (2) this instruction was reinforced by the prosecutor's victim/witness coordinator, the then prosecuting attorney instructed Winzen to "tell the truth".

■ The double jeopardy clause of the Fifth Amendment of the United States Constitution protects a criminal defendant from repeated prosecutions for the same offense. *State v. Willers*, 785 S.W.2d 88, 90 (Mo.App.1990). This right attaches at the time the jury is impaneled and sworn.

*Id.* Following the attachment of jeopardy, if a mistrial is declared and the jury discharged, a defendant may be retried in one of two circumstances. *Id.* The first is one where the trial court declares a mistrial without the defendant's request or consent, after the trial court, in its discretion, concludes that justice would not be served by a continuation of the proceedings. *Id.* An example of a situation sufficient to remove the double jeopardy bar in a court-declared mistrial is after a jury's announcement that it is unable to reach a verdict. *Id.* The second circumstance is one in which the defendant requests or consents to the mistrial. *Id.* In this circumstance, however, if the defendant's mistrial request was motivated by the prosecutorial conduct which was intended to goad the defendant into requesting a mistrial, double jeopardy will bar reprosecution. *Id.*

 In the case at bar, the trial court granted the mistrial after Fleer requested it. The burden is on the defendant to prove that this request was the result of erroneous prosecutorial conduct calculated to coerce the defendant into requesting a mistrial. *Id.* Fleer has not done so. During the hearing on Fleer's motion to dismiss on the basis that double jeopardy had attached, the prosecutor testified that on May 21, 1990, as he exited the courthouse elevator, Steve Winzen grabbed his arm. The prosecutor further testified that Winzen stated something about Fleer and a fight. The prosecutor stated that Winzen may have told him that the assistant prosecutor instructed Winzen not to testify that the first time that he met Fleer, Fleer was beating a woman. The prosecutor stated, however, that he told Winzen that there were restrictions on what the State could ask. He further stated that Winzen was concerned about a question that he did not feel that the assistant prosecutor would ask. The prosecutor testified that he told Winzen, as he tells all witnesses, that when Winzen went into the courtroom, he should tell the truth. The prosecutor additionally testified that he told Winzen to speak with the assistant prosecutor before testifying. Finally, the prosecutor testified that he did not deliberately incite Winzen to occasion the mistrial.

Having thoroughly reviewed the trial transcript, we conclude that the prosecutor was not telling Winzen to ignore instructions from both the assistant prosecutor and the State's victim/witness coordinator. Rather, the prosecutor specifically informed Winzen that: (1) the State is restricted in what it may ask; (2) he did not believe the assistant prosecutor would delve into the area that Winzen was concerned about; and (3) when testifying about matters that the State could inquire about, Winzen should tell the truth. Since Fleer failed to prove that the prosecutor intended to goad him into requesting a mistrial, the trial court did not err in overruling his motion to dismiss on the basis of double jeopardy. Fleer's eighth point is, therefore, denied.

Fleer's ninth point is that the trial court erred in overruling his motion for judgment of acquittal at the close of all of the evidence. Fleer contends that there was insufficient credible evidence of his guilt to: (1) submit the case to the jury; and (2) support the verdict.

 In addressing a challenge to the sufficiency of the evidence, an appellate court accepts as true all evidence, whether direct or circumstantial, which tends to prove a defendant guilty together with all reasonable inferences supportive of the verdict. *State v. Hill,* 808 S.W.2d 882, 890 (Mo.App.1991). We disregard contrary evidence and inferences. *State v. Reed,* 811 S.W.2d 50, 52 (Mo.App.1991). We determine whether the evidence, so viewed, was sufficient to make a submissible case—one from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

 Circumstantial evidence is evidence that does not directly prove a fact in issue but gives rise to a logical inference that the fact exists. *State v. Harris,* 807 S.W.2d 528, 529 (Mo.App.1991). Direct evidence is evidence that proves a fact in issue without other inference of that fact. *Id.*

 Where the State has adduced only circumstantial evidence, the reviewing court must apply the circumstantial evidence test that Fleer contends we must apply here. Under that test, the State's evidence must exclude any reasonable hypothesis of innocence. *Id.* Where, however, any direct evidence exists, as it does here, the test of sufficiency changes. The proper test then requires that, based on all evidence supporting the jury's verdict, including all favorable inferences taken as true, and discounting all adverse inferences, the State proved all elements of the charges by substantial evidence. *Id.*

 Admissions of a criminal defendant are direct evidence of his guilt. *State v. Newbold,* 731 S.W.2d 373, 380 (Mo.App. 1987). In the case at bar, Ronald Eugene Boyer, Jr., testified that while he was in prison, he overheard a conversation during which Fleer admitted that he was guilty of the crimes for which he was charged. This admission is direct evidence of Fleer's guilt.

Moreover, this case is replete with circumstantial evidence which indicates that Fleer murdered both Tyler and Price. We review four categories of such evidence.

First, Fleer had the opportunity to kill both Tyler and Price. This is apparent when reviewing three witnesses' testimony. First, Mari Kane testified that while Fleer waited for her to finish her "shoplifting class", he had the keys to both her car and her apartment. This testimony explains how Fleer could have entered the apartment without a forcible entry. Second, Neil Myrick testified that between approximately 9:30 a.m. and 10 a.m. on August 7, 1986, he observed Fleer jogging in the rain. Myrick further testified that he observed Fleer enter Kane's apartment building, exiting approximately five minutes later. This testimony links Fleer to the crime scene at approximately the time of Tyler's and Price's deaths. And third, Patricia Abegg testified that at approximately 10:40 a.m. on August 7, 1986, she saw Fleer exiting the Stillbrook apartment complex. Abegg further testified that Fleer's hair was "messed up", which was very unusual

as Fleer has a reputation for neatness. This testimony, too, links Fleer to the crime scene at approximately the time of Tyler's and Price's deaths.

Second, Fleer had a motive to kill Tyler and Price: retaliation for a drug deal gone bad. Joan Boyer–Midgett, Michael Karll, and David Wayne Powers each testified that Fleer told them that Tyler and Price were murdered over drugs. Boyer–Midgett additionally testified that Fleer told her that: (1) he and Howlett purchased some cocaine; (2) there was something wrong with it; (3) he and Howlett attempted to contact Winzen since he had given them the name of the man from whom they purchased the cocaine; and (4) he and Howlett were unsuccessful in this attempt. Based on this testimony, the State posited that Fleer killed Tyler in retaliation because Winzen set them up with bad cocaine. The State further posited that Fleer murdered Price because she was a witness to Tyler's murder.

Third, the record is replete with examples that Fleer was conscious of his guilt. William Baldwin testified that Fleer lied to him about his whereabouts on the day of Tyler's and Price's murders. Baldwin stated that Fleer initially told him that he: (1) slept in his trailer the night before Tyler and Price were murdered; (2) awoke at approximately 11:30 a.m. the following day; (3) went over to try to contact Howlett at his apartment; and (4) left Howlett's apartment since he was unable to raise Howlett. Baldwin further stated that later Fleer told him that this explanation of his whereabouts was just a story. Baldwin's testimony indicates that Fleer was conscious of his guilt and that he, therefore, lied in order to conceal his whereabouts at the time of the murders.

Tim McEntee also testified that Fleer said that he lied about being near the murder scene on the day of the murders. McEntee further testified that Fleer explained to him that on the day of the murders, he was at Howlett's apartment. He woke up, went home and cleaned up. Finally, McEntee testified that Fleer told the police that he and Jeffrey Neal Eder were

together when they discovered Howlett dead. McEntee stated that Fleer later confessed that he and Eder worked up this story for the police; Fleer was alone when he discovered Howlett's body.

In addition to lying to the police in an effort to conceal his whereabouts, two other key pieces of circumstantial evidence indicate Fleer's consciousness of guilt. First, William Smith testified that Fleer told him: (1) that he was kind of glad that Howlett was dead because it took the heat off him; and (2) he should not have allowed the police to take a pubic hair off of him because now they will "pin it on [me]". Second, Richard Harris testified that Fleer said that he was aware that the case had been reopened and that he knew that it was only a matter of time before the police came after him. All of these pieces of evidence could lead the jury to believe that Fleer murdered Tyler and Price.

Finally, the record is replete with circumstantial evidence that Fleer knew facts about Tyler's and Price's murders that he would not have known unless he was the murderer. Rod Conway testified that Fleer told him that: (1) Tyler was in pajamas when he was murdered; (2) Price was watching television when she was murdered; and (3) there was no forcible entry into Kane's apartment. Moreover, both Conway and Boyer–Midgett testified that Fleer told them that the murderer put the children in hot water to remove fingerprints and impressions. Conway also testified that Fleer told him that: (1) whoever murdered the children must have cleaned up because there was no evidence; (2) whoever killed the children did so with their bare hands; and (3) Price was beaten so badly that it looked like the esophagus in her neck was destroyed. The State argued that although it was not true that Price was beaten, the murderer may have believed that in strangling Price he destroyed her esophagus. Finally, John Foens testified that he saw Fleer at Howlett's apartment at 12:00 p.m. or 12:30 p.m. Foens further testified that he told Fleer that Tyler and Price were murdered. Foens stated that at that point, he was not aware that the screen to Tyler's bedroom window

was cut or that the children were placed in hot water in the bathtub. Foens also stated that Fleer left Howlett's apartment and did not return the rest of the day. Ironically, Ruth Eder testified that Fleer told her that somebody broke in through the screen in Tyler's bedroom window and murdered Tyler and Price.

A person commits that crime of first degree murder if he knowingly causes the death of another person after deliberation upon the matter. § 565.020.1, RSMo.1986. For purposes of first degree murder, deliberation means cool reflection for any length of time no matter how brief. § 565.-002(3), RSMo.1986.

In *State v. Antwine*, 743 S.W.2d 51, 72 (Mo. banc 1987), our supreme court stated that direct evidence of deliberation is not necessary to support a first degree murder conviction; it is sufficient that deliberation is reasonably inferred from the circumstances surrounding the murder. Here, the evidence was sufficient to enable the jury to find that Fleer: (1) filled the bathtub with cold water; (2) drowned Tyler in the cold water; (3) strangled Price; and (4) drowned Price in the cold water. These factual circumstances, and the time necessary to accomplish them, would justify the jury in inferring that Fleer had the opportunity to coolly reflect, for any length of time, no matter how brief, before killing these two children. *State v. Loggins*, 778 S.W.2d 783, 787 (Mo.App.1989). Fleer's ninth point is, therefore, denied.

■ Fleer's tenth point is that the trial court erred in overruling his motion to disqualify the office of the prosecuting attorney of Jefferson County, Missouri, because the office committed misconduct under Missouri Supreme Court Rule 8.4 by violating Missouri Supreme Court Rules 3.4(d), 3.8(a) and 4.2. Specifically, Fleer alleges that the prosecuting attorney and the assistant prosecuting attorney: (1) unethically eavesdropped on defense counsel's interview with the State's witness Michael Watson; (2) communicated directly with witness George Taylor even though he was represented by an attorney who objected to this

direct communication; (3) withheld disclosing changes in the proposed testimony of State's witness, David Powers; (4) prosecuted a charge that was not supported by probable cause; and (5) refused to withdraw endorsed witnesses who would not be subpoenaed to testify at trial.

 Section 56.110, RSMo.1986, addresses the disqualification of a prosecutor. It states:

> [i]f the prosecuting attorney and assistant prosecuting attorney be interested or shall have been employed as counsel in any case where such employment is inconsistent with the duties of his office, or shall be related to the defendant in any criminal prosecution, either by blood or by marriage, the court having criminal jurisdiction may appoint some other attorney to prosecute or defend the cause.

A motion to disqualify a prosecuting attorney, under § 56.110, RSMo.1986, on the basis that he has a personal interest in the outcome of a case is necessarily directed to the trial court's discretion. *State v. Choate*, 722 S.W.2d 643, 647 (Mo.App. 1986). Fleer neither alleges nor is there any evidence before this court that any grounds for a statutory disqualification were present. The trial court properly denied Fleer's motion. *State v. Williams*, 643 S.W.2d 641, 642 (Mo.App.1982). Fleer's tenth point is, therefore, denied.

The judgment of the trial court is affirmed.

GARY M. GAERTNER, P.J., and SMITH, J., concur.