**STATE of Missouri, Respondent,**

v.

**Lester Wayne DAGLEY, Appellant.**

**No. WD 41959.**

Missouri Court of Appeals,
Western District.

June 5, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 31, 1990.

Application to Transfer Denied
Sept. 11, 1990.

David S. Durbin, Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before NUGENT, C.J., and SHANGLER and FENNER, JJ.

NUGENT, Chief Judge.

Defendant Lester Wayne Dagley appeals from his conviction on two counts of involuntary manslaughter and leaving the scene of a motor vehicle accident. He received concurrent sentences of six years on each manslaughter conviction and three years on the conviction of leaving the scene of a motor vehicle accident.[1]

We affirm the judgment of the trial court.

Early in evening of December 7, 1985, Darrell Scott and Randy Simpson drove a 1955 Ford Thunderbird west on Highway 92 toward Kearney. Just after they had crossed the Clear Creek Bridge, the young men pulled onto the two-lane highway's right shoulder to replace the left rear wheel, which had fallen off. Because of the shoulder's narrowness, when they parked, only a car length or two from the edge of the bridge, the driver's side of the T–Bird extended at least a foot into the highway's westbound lane. Thus, while working on the tire, one of the young men squatted several feet into that lane. The other young man held a flashlight and stood near the rear of the car, at times warning oncoming motorists.

The record includes differing testimony of the evening's conditions. Some witnesses testified that night had already fallen, but others testified that they had not yet needed to turn on their headlights. The record does show that the T–Bird had an illuminated left headlight, although it does not conclusively show that the car had a lighted taillight. In addition, although some witnesses testified that they found the road and air generally dry that evening, police witnesses described the evening as damp, the road as "wet" and "gritty."

A little before six-thirty, Curtis and JoAnn Hamilton and their son, heading east in their car, approached the disabled T–Bird. Immediately behind them drove Otis and Laverne Peek in a pickup truck. Both couples testified that as they approached the disabled car, westbound motorists passing them flashed their headlights. Upon seeing the T–Bird and the young men, the Hamiltons slowed, passed

---

1. On March 24, 1989, this court heard Mr. Dagley's appeal from his postconviction hearing, and sustained the state's motion for remand.

On rehearing, the hearing court reimposed the original sentences.

the scene, and crossed the narrow bridge. According to trial testimony, at that time from one to three westbound cars crossed the bridge and passed the Hamiltons.

The Peeks meanwhile pulled over onto the south shoulder of the road to allow those cars to drive around the disabled car and the two young men by pulling into the eastbound lane. The Peeks testified that they, the Hamiltons and the drivers of the westbound cars all slowed to a low speed in passing the T–Bird.

After the last car had passed, the Peeks crossed the bridge. As they left the bridge, a Westbound black pickup truck passed them travelling at about fifty-five to sixty miles per hour. Ms. Peek exclaimed her fear that the truck would hit the disabled car. Ms. Hamilton testified that when the black truck passed her she too feared a collision.

Moments after the black pickup passed the Peeks, they and the Hamiltons heard a crash. Ms. Peek testified that she looked over her shoulder and saw through her truck's rear window, sparks flying. The Peeks turned around and returned to the disabled T–Bird. They drove along slowly past the car and stopped when they saw Messrs. Scott and Simpson lying on the grass just beyond the gravel shoulder, over one hundred feet from the T–Bird. Ms. Peek got out to stay with them while her husband and son went for help. She found Mr. Scott unconscious but gasping for air; she took Mr. Simpson's pulse, but found none. While Ms. Peek waited, Laveta Smith and her daughter arrived, and the three covered the young men with their coats.

Meanwhile, Mr. Peek had reached a fire station and reported the accident. The Hamiltons soon returned to the scene, after trying unsuccessfully to telephone the authorities from a house where they could find no one at home. Soon, both fire fighters and police arrived at the scene, as did an ambulence and an emergency medical helicopter. One of the young men died at the scene of the accident, the other at a hospital not long after.

An officer responded to a dispatcher's call to go to a liquor store to take a report on a stolen vehicle. There the officer met and questioned defendant Dagley, who explained that at nine o'clock that morning he awoke to find his truck missing. He then went back to sleep, he explained, and upon getting up that afternoon, reported his truck stolen. He told the officers that he hoped the person who had stolen his truck had not hurt or killed somebody with it.

After receiving reports about the accident, the police read Mr. Dagley a *Miranda* warning, and he waived his right to remain silent, declaring that he had nothing to hide. During the questioning that followed, he admitted that he had had an accident early that evening at the bridge and signed a statement inculpating himself. He admitted that he indeed had driven the black pickup truck, striking the two young men. He further admitted that initially, he drove back to Kearney, his home, where he parked his truck and telephoned the police from a nearby liquor store to report that someone had stolen his truck that morning. He explained that he had fled the accident scene because he feared that, having already temporarily lost his license due to drunk driving, he would lose it again if caught driving drunk.

One of the interrogating police officers testified that he noticed a strong alcoholic odor on Mr. Dagley's breath. The officer also testified that Mr. Dagley appeared intoxicated and that a breathalizer test given to Mr. Dagley shortly after the accident revealed his blood alcohol level at .16 per cent.[2]

The grand jury indicted Mr. Dagley on one count of leaving the scene of an accident and on two counts of involuntary manslaughter. The latter counts charged that while drunk Mr. Dagley had failed to maintain a proper lookout, failed to yield to a pedestrian, and failed to maintain proper control of his vehicle, thus striking and

**2.** Under § 577.037.1, Missouri Revised Statutes, 1986, a blood alcohol level higher than 0.1 percent constitutes prima facie evidence of intoxication. *State v. Kliegel,* 674 S.W.2d 64, 65 (Mo. App.1984).

killing the two victims. Later, the prosecuting attorney filed a superseding information that charged the defendant with two counts of involuntary manslaughter and one count of leaving the scene. A petit jury convicted the defendant on all three counts.

■ An appellate court reviewing a criminal conviction must accept as true all evidence, whether direct or circumstantial, tending to prove the defendant's guilt. It must also accept all reasonable inferences supporting the verdict. *State v. Williams*, 652 S.W.2d 102, 111 (Mo.1983) (en banc). At the same time, the court must disregard all parts of the record contrary the verdict. *State v. Brooks*, 618 S.W.2d 22, 23 (Mo. 1981) (en banc).

We first address Mr. Dagley's second and third points on appeal. In his second point, he contends that the trial court erred in sustaining the state's objection to testimony by a Missouri State Highway Patrol trooper on Mr. Dagley's driving and the location of the disabled T–Bird. Mr. Dagley argues that the questions to Sgt. Larry Williams elicited information relevant to his defense.

■ At trial, defense counsel asked Sgt. Williams whether the victims had parked the T–Bird illegally on the shoulder of the highway and whether Mr. Dagley had driven improperly. The state objected to each question, arguing that the questions required the trooper to draw legal conclusions. The trial court sustained the objections and denied defense counsel's motion to voir dire the witness outside the hearing of the jury.

Defense counsel failed to preserve the error for appellate review by making the required offer of proof. *State v. Schneider*, 736 S.W.2d 392, 401 (Mo.1987) (en banc), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). "An offer of proof must demonstrate the relevancy of the testimony offered, must be specific, and must be definite." *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo.1983) (en banc). Usually, a proper offer of proof entails questions to a witness on the stand. *School Dist. of Indepen-*

*dence v. U.S. Gypsum Co.*, 750 S.W.2d 442, 453 (Mo.App.1988). Defense counsel did not specifically offer to demonstrate the relevance of the elicited testimony after the trial court sustained the state's objection. Nor did counsel offer to show for what definite purpose he elicited the testimony.

■ If at trial complete understanding exists regarding the elicited testimony, the objection refers to a category of testimony rather than to specific testimony, and the evidence will help its proponent, counsel need not make an offer of proof to preserve the trial court's error in refusing to admit the evidence. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 883 (Mo.1985) (en banc). Here, however, the record does not show what Sgt. Williams would have said in response to the questions and consequently it does not show that the testimony would have helped Mr. Dagley.

■ Even if he had made a proper offer of proof, we can find no relevance in the conclusions defense counsel elicited from the sergeant. Relevant evidence logically tends to prove or disprove a fact in issue. *State v. Prewitt*, 714 S.W.2d 544, 551 (Mo. App.1986). Here, however, defense counsel failed to demonstrate that the elicited testimony would logically have proven a fact in issue. We may only review a trial court's ruling on a relevancy question for abuse of discretion. *Id.* Here, we find no error whatsoever.

■ In his third point on appeal, Mr. Dagley maintains that the original indictment improperly charged him with involuntary manslaughter because it "alleged more than one mode of commission in the disjunctive." He argues that even though the state later filed a superceding information, it could not resuscitate a charge so defective that it does not constitute a proper charge. The defendant correctly asserts that allegations in an information that a defendant committed a crime in one or the other of two or more inconsistent ways does not properly charge the defendant. *State v. Fox*, 46 S.W.2d 544, 546 (Mo.1932). In *Fox*, the state charged the defendant

with possessing a deadly weapon while a driver or passenger of an automobile. There, the court found the information invalid because it charged the defendant with one of two inconsistent roles.

In the case before us, however, neither the indictment nor the superseding information contained inconsistent allegations as to the methods of commission of the crimes. Mr. Dagley could have failed to maintain a proper lookout and failed to yield to a pedestrian and failed to maintain proper control of his vehicle all at the same time.

■ In his first point on appeal, Mr. Dagley argues that the evidence could not have supported a finding beyond a reasonable doubt that he acted with criminal negligence. The defendant raises a difficult question. No witness could testify to a clear view of the impact of the accident. At best, one witness saw the sparks from the collision through the rear view window of a car driving away from the scene on a darkening night. Nevertheless, as noted above, we must accept as true all evidence supporting the verdict, including circumstantial evidence. *State v. Williams, supra*, 652 S.W.2d at 111. The circumstantial evidence in this case supports the verdict.

■ To prove involuntary manslaughter, the state must prove three essential elements: that (1) the defendant drove in an intoxicated state and (2) acted with criminal negligence (3) in causing another's death. § 565.024.1(2)[3]. Although intoxication alone does not support a manslaughter conviction, it serves as a factor which the trier of fact, in determining whether criminal negligence exists, may consider in connection with other evidence. *See State v. Kays*, 492 S.W.2d 752, 758 (Mo.1973); *State v. Carter*, 451 S.W.2d 340, 344 (Mo. 1970). The culpable negligence requirement that *State v. Carter* dealt with requires stricter proof than the criminal negligence element set out in § 565.024.1(2).

*State v. Kliegel*, 674 S.W.2d 64, 68 (Mo. App.1984).[4]

Section 562.016.5 defines criminal negligence as failure "to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow ..." and requires that such failure constitute "a gross deviation from the standard of care which a reasonable person would exercise in the situation." *See also id.* at 67.

■ Missouri law requires that every person operating a motor vehicle on the highways of this state shall exercise the highest degree of care. § 304.010.1. This requirement imposes on all drivers not only the duty not to drive in a dangerous fashion but also the positive duty to exercise unusual caution in extraordinary situations. Thus, for example, a sober person driving at the speed limit who sees a pedestrian crossing the road ahead but takes no action to avoid hitting that pedestrian acts in a criminally negligent manner by failing to notice, that is, "to be aware of" the "substantial ... risk," and to take actions to avoid an obviously dangerous situation.

The record shows that several drivers immediately preceding defendant Dagley that night, in the exercise of the highest degree of care, safely passed the T–Bird and warned oncoming cars by flashing their headlights. Undoubtedly alerted by the Peeks' waiting truck as well as the sight of the "substantial ... risk" posed by the men in the roadway beside the disabled T–Bird, those drivers carefully slowed down as they crossed the bridge. They carefully maneuvered round the car and the men, thanks to the Peeks having pulled their truck onto the opposite shoulder to allow oncoming cars to pass round the T–Bird by driving partly in or near the edge of the eastbound lane.

Mr. Dagley took no such precautions. The evidence does not show that he reduced his speed. The jury could only infer from the evidence that he failed to avoid

---

**3.** All sectional citations refer to Missouri Revised Statutes, 1986.

**4.** Although the defendant in *Kliegel* appealed from a conviction for vehicular manslaughter,

Judge Shangler explained that as of July 1, 1984, vehicular manslaughter ceased to exist as a separate offense and its elements became a form of involuntary manslaughter under § 565.024.

the T–Bird despite the "substantial and unjustifiable risk" that the existing circumstances presented to him and the men on the road. Other cars had passed round the disabled car even with the Peeks' truck on the other side of the road. Mr. Dagley had no such obstacle to consider. The jurors could reasonably have inferred that he struck the young men only because he failed to maintain the lookout required of a careful driver on a busy road. In so concluding, the jurors could reasonably have found that Mr. Dagley's actions constituted criminal negligence.

A reasonable driver would have realized (and some did) that young men standing in the roadway beside a disabled car protruding into the road created a substantial risk of danger. Yet Mr. Dagley failed to notice this risk, and in that failure lies the first element of criminal negligence. His consequent failure to take any evasive action to avoid the young men and the T–Bird constituted a gross deviation from the standard of care reasonable persons, here the drivers preceding him past the car, would have exercised and did exercise in that situation. Therein lies the remaining element of criminal negligence.

Mr. Dagley contends, however, that his actions did not rise to the level of the criminal negligence required for conviction in other cases of involuntary manslaughter. *See State v. Stottlemyre,* 752 S.W.2d 840 (Mo.App.1988) (defendant's driving a motorcycle at a high rate of speed on a dam at night constituted criminal negligence); *State v. Kliegel, supra,* (defendant's failure to stop at a flashing red light constituted criminal negligence). That some defendants in other situations acted more outrageously than Mr. Dagley acted does not mean that his own conduct did not fall below the level of criminal negligence. We must judge each case on its own facts.

If as a matter of law the prosecution made a submissible case, as we believe it did, we may not second guess the verdict of the jurors. Nothing in the record compels us to find that the jurors in Mr. Dagley's case could not reasonably have found beyond a reasonable doubt that, in view of the circumstances together with the actions of the other drivers that night, Mr. Dagley's actions constituted criminal negligence.

Thus, the evidence sufficiently established all three of the essential elements of involuntary manslaughter and supports the jury's verdict.

For the foregoing reasons, we affirm the judgment of the trial court.

All concur.