STATE of Missouri, Plaintiff/Respondent,

v.

Anthony TODD, Defendant/Appellant.

No. 69076.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 29, 1996.

Herbert T. Diekemper, Jr., St. Louis, for defendant/appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Fernando Bermudez, Assistant Attorney General, Jefferson City, for plaintiff/respondent.

REINHARD, Judge.

Defendant appeals after he was convicted of two counts of involuntary manslaughter, § 565.024, RSMo 1986, and one count of second degree assault, § 565.060.1(4), RSMo Supp.1993. The court sentenced him in accordance with the jury's assessment to three consecutive thirty day terms of imprisonment and a $5,000 fine for each conviction. The court suspended execution of the fines and ordered five years probation. We affirm.

The evidence reveals that at approximately 7:30 p.m., on August 13, 1993, defendant, Ron Edgar, Ron Byer, Rick Baum, and Christopher Anderson met at Edgar's home in High Ridge, Missouri. Because their float trip plans were cancelled, they decided to go to Russell Wall's house. Defendant, age 18 at the time, drove his white Chevrolet Blazer, and Edgar, Byer, and Anderson rode with him. Byer was dropped off at his home, and the other three stopped at a liquor store to buy beer and some Jack Daniel's coolers.

After arriving at Wall's house, defendant joined in a drinking game called "Cardinal." Anderson·described the rules of the Cardinal game as "[s]omeone does a pattern or something and then the other person has to follow it. If they don't get it right they drink." Because defendant played badly, he had to drink a lot of beer and subsequently vomited.

At some time prior to midnight or 12:30 a.m., Matheson Friemon saw defendant stumble, stagger, and speak in a slurred manner as if he were drunk. Furthermore, at some point during the evening, defendant and Anderson left Wall's home and drove to a liquor store to buy a case of beer.

At approximately 1:00 or 1:30 a.m., on August 14, 1993, defendant, Anderson, Wall, and Edgar left Wall's house and went to the home of Kim Thayer. Defendant drove and the others were passengers in his vehicle. Thayer was not home when they arrived, so they went to a nearby party at Tim Gardner's house. After staying a short while, they returned to Thayer's home.

When they left Thayer's residence, defendant got in the driver's seat, and Edgar got in the passenger's seat. Anderson sat in the rear left seat, and Wall sat in the rear right seat. On their way to take Wall home, defendant drove to the drive-through window at Hardee's and ordered food. When defendant left Hardee's, he turned west on Highway 30. Anderson testified that defendant "accelerated pretty fast" when he left Hardee's parking lot and pulled onto Highway 30.

At approximately 4:45 a.m., defendant entered the intersection of Highway 30 and BB. His truck struck a lane directional sign located on a concrete island, which separated the "right turn only" lane from the through lanes of traffic. The truck then struck the concrete base of a traffic signal post. The force of the impact caused the hood, the front bumper, a tire, and an axle to fly off of the truck.

A witness to the accident, Michelle Bauer, heard a loud bang and saw "a white truck crossing Highway 30." She testified that the truck was traveling fast and that it "wasn't on the ground." Although there was testimony at trial about the presence of fog, Bauer did not remember any fog or wet pavement at the scene of the accident, and there was no evidence that anything obstructed the intersection.

After the accident, Edgar and Wall did not have any vital signs of life, and they both died at the scene from head injuries. Defendant and Anderson, however, exited the vehicle without assistance. Anderson was hospitalized for two days and treated for head, ankle, and wrist injuries. Defendant was also taken to the hospital following the accident. While defendant was being examined for injuries, his blood was drawn for testing. At trial, an affidavit from Barnes Hospital attached to a copy of defendant's laboratory

report was offered and received into evidence. According to the laboratory test results, his blood alcohol content at 6:00 a.m. was one hundred and ten milligrams per deciliter or .11 grams per hundred milliliters of blood.

Dr. Mary Case, the medical examiner for Jefferson County, St. Louis County, St. Charles County, and Franklin County, testified for the state. She did a residency training in pathology and is one of approximately five doctors in the country to be board certified in anatomical pathology, neuropathology, and forensic pathology. Dr. Case was qualified as an expert witness. She explained that defendant's blood alcohol test revealed .11% blood-alcohol. She also testified that his alcohol content would have been higher when the accident occurred at 4:45 a.m. Dr. Case stated that she is vaguely familiar with the blood testing procedures of Barnes Hospital. She testified that Barnes uses clinical pathology methods and tests the plasma, rather than the whole blood. According to Dr. Case, a slightly different result may occur if the whole blood is tested. The variation may be between 10–20%.

Dr. Case also testified that anyone with a blood alcohol percentage above .08% is intoxicated and "no longer safely able to operate a motor vehicle." Dr. Case stated that alcohol primarily affects the central nervous system. It impairs one's attention, memory, comprehension, learning abilities, and the ability to make critical judgments. Alcohol also impedes a person's visual acuity, slows one's reaction time, affects balance and coordination, and causes drowsiness. Dr. Case testified that in her opinion defendant was "under the influence of alcohol, that he was intoxicated and that in terms of safely operating a motor vehicle he would be impaired."

Defendant called several witnesses. John Koenig, the technical supervisor in the clinical chemistry laboratory at Barnes Hospital, testified about the laboratory worksheet and test results that were prepared from defendant's blood test. Koenig described the method that Barnes laboratory uses to run ethyl alcohol assays. He stated that the records indicate the blood was taken from defendant and that his alcohol content was one hundred and ten milligrams per deciliter.

Defendant also called Thayer. She testified that the four men arrived at her house around 1:30 or 2:00 a.m. and stayed approximately two hours. During this time, she did not notice anyone drinking alcohol. She and Wall, however, were talking in the living room, and the others were in the kitchen.

Mary Johnson, a Hardee's employee, took defendant's food order, spoke with him, and served him food on August 14, 1996, at approximately 4:00 a.m. She testified that she did not smell alcohol on defendant or notice any other evidence of alcohol.

Troy Smith testified that he was at Wall's house and that defendant did not appear intoxicated. He stated that defendant only drank a small amount of beer before vomiting during the drinking game.

Defendant testified that he did not consume any alcohol before arriving at Wall's house. Defendant admitted, however, that from approximately 8:30 p.m. to 1:45 a.m., he drank about six or seven beers. He drank two beers at Wall's house before playing "Cardinal," two beers during the game, one beer after the game while he was still at Wall's home, one-half of a beer the first time they went to Thayer's home, and one-half of a beer at Gardner's party.

Defendant testified that they left Thayer's house around 4:00 a.m. He stopped at Hardee's on the way home and then drove westbound on Highway 30. Defendant testified that on other occasions he had driven westbound on Highway 30 through the intersection of Highway BB. He denied, however, that he had driven through the area during adverse weather conditions, such as fog.

Defendant testified that Highway 30 was covered with patches of heavy fog on August 14, 1996. Therefore, he drove using the white guide line located on the right side of the road. He saw an "orange haze," which turned out to be the intersection of Highway 30 and BB. When defendant noticed that he was in a "right turn only" lane, he tried to veer left to get in the through lane. Defendant stated that he did not notice that he was in the wrong lane until he was approximately

five feet away from a sign located on a concrete island, which separated the "right turn only" lane from the through lane. He hit this traffic sign and then hit the concrete base of a light post.

Defendant's witness, Richard Brown, a design engineer for the Missouri Highway and Transportation Department, said that according to an accepted definition of "roadway," the concrete island is not located in or on the roadway. In addition, Brown testified that the intersection's design was within standard norms.

Defendant testified that after the accident, he relied on the trained doctors, lab technicians, and nurses at Barnes Hospital to test and diagnose what was wrong with him. He stated that they did a good job, he did not know of any mistakes they made, and to his knowledge, the test results were correct.

On appeal, defendant claims that the state failed to make a submissible case. He partially relies on the alleged erroneous admission of Exhibit 34, which was the laboratory report setting forth the results of defendant's blood alcohol test. Thus, before discussing the issue of submissibility, we address his evidentiary point. That point states:

> The trial court erred in admitting into evidence the result of a blood alcohol test under the Uniform Business Records as Evidence Act, RSMo. § 490.692, without requiring the state to lay some statutory or common law foundation of validity or accuracy prior to the admission of such test result, for the reason that RSMo. § 577.020 through § 577.041 make manda-

tory the literal compliance with certain methods and procedures prerequisite to admission of such a blood alcohol test result, and the state failed to introduce evidence upon which the trial court could have found validity and/or accuracy in such test result.

The state claims that the Missouri implied consent law is not the exclusive means to admit blood alcohol test results and urges that the prosecutor laid a sufficient foundation for admission of the document under the business records exception.[1] Defendant concedes that the proper foundation was laid for admitting the hospital record under the Uniform Business Records Act, § 490.692, RSMo Supp.1993. Defendant urges, however, that after the proper foundation for a hospital record is shown, an additional foundation is required for the admission of a blood alcohol test. It appears that a Missouri court has not addressed this specific issue.

We note that at trial defendant objected properly to the lack of foundation for admitting the blood test result. We also note that the trial court considered this issue. The state recognized the requirements of Missouri's implied consent law and stated that it was not proceeding under the implied consent law but was offering the test result under the business records as evidence law.

Ordinarily when we review cases involving the admission of blood alcohol test results, the following factual scene is presented: a law enforcement officer has pulled over the driver of a vehicle or has discovered a driver at an accident scene; that driver has con-

---

1. This court previously observed that the implied consent law is "at best confusing and at worst contradictory." *State v. Kummer*, 741 S.W.2d 285, 288, n. 2 (Mo.App. E.D.1987). Although a Missouri court has not decided whether the implied consent law is the exclusive means of introducing blood test results, other cases have, in dicta, made reference to the issue. *See State v. Vaughn*, 759 S.W.2d 98, 101 (Mo.App. S.D.1988); *Kummer*, 741 S.W.2d at 288 (*citing State v. Peters*, 729 S.W.2d 243 (Mo.App.1987)). *See also State v. Waring*, 779 S.W.2d 736 (Mo.App. S.D. 1989) (where blood sample was drawn by emergency room physician, result of blood alcohol test seized under valid search warrant was admissible despite defendant's claim that blood test was not taken pursuant to implied consent law and was not admissible).

In addition, other states have discussed the issue and decided that in certain situations, blood test evidence is admissible without compliance with department of health requirements or the state's implied consent law. *See e.g., Weaver v. State*, 290 Ark. 556, 720 S.W.2d 905 (1986) (holding blood test ordered by emergency room physician for use in treating patient need not comply with requirements of state health department and could be admitted under the Arkansas rules of evidence); *State v. Lendway*, 519 So.2d 725 (Fla.Dist.Ct.App.1988) (holding that blood test evidence may be admitted so long as Florida's traditional predicates for admissibility are satisfied).

sented to a blood alcohol test; and the officer has taken that person to a location where the blood test is performed pursuant to the officer's direction. Once the proper foundation is laid at trial, the blood test evidence is admissible, and if the blood alcohol content is ten-hundredths of one percent or more, this is prima facie evidence that the person was intoxicated. *See* § 577.037, RSMo Supp. 1993. In the present case, however, the blood test was performed during the medical diagnosis and treatment of defendant. It was not conducted at the request or direction of a law enforcement officer nor for the purpose of litigation.

Missouri's implied consent law provides that chemical analysis of a person's blood "to be considered valid under the provisions of sections 577.020 to 577.041 shall be performed according to methods approved by the state division of health by licensed medical personnel or by a person possessing a valid permit issued by the state division of health for this purpose." § 577.020.3, RSMo 1986. According to the Missouri Department of Health's provisions, however, "[o]nly those laboratories or persons performing analysis of blood ... at the direction of a law enforcement officer acting under the provisions of sections 577.020–577.039, RSMo, and 577.041, RSMo—are subject to the rules in this chapter." MO.CODE REGS. tit. 19, § 20–30.011(1) (1996). Similarly, the requirements for performance of the blood alcohol tests, set forth in § 577.029, RSMo 1986, apply to licensed physicians, registered nurses, or trained medical technicians "acting at the request and direction of the law enforcement officer."

■ According to the plain language of the statute and regulations, the requirements and protection provided by the implied consent law do not apply to all blood tests offered as evidence but only those offered pursuant to Chapter 577. Thus, we consider whether the evidence in the present case, which was not offered under Chapter 577, is admissible under the Uniform Business Records Act.

The business records as evidence law provides that a record of an act, condition, or event is competent evidence if three requirements are met: (1) the custodian or qualified witness testifies to its identity and mode of preparation; (2) it was made in the regular course of business, at or near the time of the act, condition or event; and (3) in the court's opinion, the sources of information, method and time of preparation justify its admission. § 490.680, RSMo 1986. The Missouri Supreme Court in *Baugh v. Life & Casualty Ins. Co.*, 307 S.W.2d 660 (Mo.1957), recognized that properly prepared hospital records are admissible in the same manner as other business records.

■ Section 490.692.1, RSMo Supp.1993, of the uniform business records as evidence law further provides that records "admissible under sections 490.660 to 490.690, shall be admissible as a business record ... upon the affidavit of the person who would otherwise provide the prerequisites...." Thus, § 490.692 provides a way to admit records into evidence without any additional direct testimony. *See Cannon v. Director of Revenue*, 895 S.W.2d 302, 304–05 (Mo.App. E.D. 1995). This court notes that the affidavit attached to defendant's blood test result was signed by the custodian of records at Barnes Hospital and is substantially the same as the example provided by § 490.692.3, RSMo Supp.1993.

■ Although we have found no Missouri cases addressing the question at hand, courts in other states have confronted similar issues. These cases support the admission of defendant's blood alcohol test as a business record.

In *State v. Garlick*, 313 Md. 209, 545 A.2d 27 (1988), the defendant was treated by an emergency room physician for injuries after an automobile accident, and that doctor ordered a toxicological screen of defendant's blood and urine. *Id.* 545 A.2d at 28. The results of this test showed the presence of phencyclidine (PCP). *Id.* At trial, defendant objected to the admission of the emergency room report because it referenced the hospital laboratory test results. The *Garlick* court stated that "once it is clear that the hospital record was made in 'the regular course of business' and the recorded transactions are 'pathologically germane to treatment' the record is admissible as an excep-

tion to the hearsay rule." *Id.* 545 A.2d at 33 (*citing Old v. Cooney Detective Agency*, 215 Md. 517, 138 A.2d 889, 893 (1958)). The court held that the entry into defendant's hospital record of his PCP-positive laboratory test result was "pathologically germane" to treatment and that it was "completely admissible without the presence of the laboratory technician as [a] witness." *Id.* 545 A.2d at 33–34.

The *Garlick* court went on to note that:

It would have been of little utility and of great inconvenience to summon every doctor, nurse, or technician who examined [defendant], took his pulse and blood pressure, drew or screened his urine and blood. Many hospital tests and procedures are performed routinely and their results are relied upon to make life and death decisions.

*Id.* 545 A.2d at 35.

In *State v. Martorelli*, 136 N.J.Super. 449, 346 A.2d 618 (Ct.App.Div.1975), the court confronted the admissibility of a blood test, which the trial court had relied upon in finding defendant guilty. Defendant's sole contention was that the hospital's laboratory report with the blood test result "was inadmissible because it does not detail the nature of the test which was utilized nor 'the expertise or competency of the person performing the test.'" *Id.* 346 A.2d at 620. The defendant argued that the report was not admissible "in the absence of the technician as a witness subject to cross-examination." *Id.*

The New Jersey court noted that "personal knowledge by the entrant-declarant is not a prerequisite for admissibility" under the business records exception, and "a statement within the record does not independently have to fall within one of the traditional hearsay exceptions" if the source of the information and method of preparation justify admitting it into evidence. *Id.* 346 A.2d at 620–21. The *Martorelli* court stated that "it is beyond dispute that a hospital performs blood tests within the regular course of its business." *Id.* 346 A.2d at 621.

According to the New Jersey court,

[N]ot all diagnostic findings are admissible. The degree of complexity of such procedures is the crucial issue. As observed by Professor McCormick, 'the admissibility of ordinary diagnostic findings customarily based on objective data and not usually presenting more than average difficulty of interpretation is usually conceded.' McCormick, Evidence (2 ed.1972), § 313 at 732.... To require those who perform tests which are relatively simple to appear in court and testify would work a hardship on an already overburdened medical system.

*Id.* 346 A.2d at 621. The *Martorelli* court found that the administering of a blood test is a relatively simple procedure. Intoxication is determined by the amount of alcohol in the brain, and because brain tissue cannot be tested, "blood analysis offers the simplest and most reliable method of ascertaining the level of intoxication." *Id.*

We believe the reasoning in these cases is persuasive. Our review of Missouri cases involving the admission of hospital records reveals a liberal construction of the business records exception. *See Baugh*, 307 S.W.2d at 665 (although entries in medical records are not conclusive, admissibility of the records is governed by business records exception); *Melton v. St. Louis Public Service Co.*, 363 Mo. 474, 251 S.W.2d 663 (1952) (hospital record, which was prepared during treatment of injury, was kept in the regular course of business and was admissible as business record); *White v. American Republic Ins. Co.*, 799 S.W.2d 183 (Mo.App. S.D.1990) (hospital records are readily admissible as business records provided there is a showing of (1) identity, (2) mode and time of preparation, and (3) that it was made in regular course of business); *Miller v. Engle*, 724 S.W.2d 637 (Mo.App. W.D.1986) (medical records are admissible in evidence under the Business Records Act). Furthermore, the results of analyses and laboratory tests are admissible data found within hospital records. *Johnson v. Creative Restaurant Management*, 904 S.W.2d 455, 459 (Mo.App. W.D.1995).

In the case at hand, the evidence consisted of the numerical result of a hospital blood test. No effort was made to admit hospital

records with conclusions regarding the test result. Evidence regarding conclusions and opinions was introduced through the testimony of Dr. Case. We hold that defendant's blood test result was properly admitted as a business record.

In defendant's second point on appeal, he alleges that the trial court erred in overruling defendant's motion for judgment of acquittal in that: (1) "there was insufficient competent evidence of defendant's intoxication at the time of the accident to prove beyond a reasonable doubt that defendant operated a motor vehicle while in an intoxicated condition . . ." and (2) "there was insufficient evidence to prove beyond a reasonable doubt that defendant drove with criminal negligence in causing the accident."

■ In reviewing a challenge to the sufficiency of the evidence, this court considers the evidence and all reasonable inferences arising therefrom in the light most favorable to the verdict. *State v. Rush,* 862 S.W.2d 936, 939 (Mo.App. E.D.1993). Contrary inferences are disregarded. *Id.* This court does not weigh the evidence nor determine the credibility of the witnesses. *State v. Garrett,* 829 S.W.2d 622, 624 (Mo.App. S.D. 1992). The test is whether the evidence was sufficient to make a submissible case from which rational jurors could have found defendant's guilt beyond a reasonable doubt. *Id.*

[6] The state had the burden to prove beyond a reasonable doubt that defendant was "(1) an intoxicated driver who (2) operated a motor vehicle with criminal negligence (3) causing the death of another." *State v. Middaugh,* 802 S.W.2d 570, 572 (Mo.App. W.D.1991).

Defendant does not contend that there was a failure of proof regarding the deaths of Wall and Edgar or the injury to Anderson. He does, however, challenge the state's evidence of intoxication and criminal negligence.

■ " 'Intoxicated condition' means under the influence of alcohol, a controlled substance, or drug, or any combination thereof." § 565.002(4), RSMo 1986. According to the state's evidence, defendant's blood alcohol content was .11 grams per hundred milliliters of blood. Dr. Case testified that defendant's

blood alcohol content would have been higher when the accident occurred at 4:45 a.m. She also testified that anyone with a blood alcohol percentage above .08% is intoxicated and "no longer safely able to operate a motor vehicle."

Anderson testified that while at Wall's residence, he witnessed defendant drinking beer and subsequently vomiting. Freimon testified that before he left Wall's residence at around midnight or 12:30 a.m., he saw defendant drinking beer. Freimon also noticed that defendant stumbled and slurred his speech. At trial, defendant admitted that he drank about six or seven beers over the course of the evening. This testimony, coupled with the result of the blood sample test, was sufficient evidence to conclude that defendant was intoxicated.

■ Section 562.016.5, RSMo 1986, defines "criminal negligence" as the failure "to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow" and such conduct amounts to a "gross deviation from the standard of care which a reasonable person would exercise in the situation." Although intoxication does not alone support a manslaughter conviction, it serves as a factor which the trier of fact, in determining whether criminal negligence exists, may consider in connection with other evidence. *Garrett,* 829 S.W.2d at 627.

According to the state's evidence, defendant was the driver of a vehicle as it proceeded west on Highway 30. The vehicle struck a lane directional sign located on a concrete island, which separated the "right turn only lane" from through lanes of traffic. The truck then struck the concrete base of the traffic signal post. An eyewitness testified that the vehicle was off the ground as it crossed the intersection. Although there was testimony about the presence of fog, there was no evidence that anything obstructed the intersection. Defendant's witness, Richard Brown, said that the concrete island is not located in or on the roadway and that the intersection's design was within standard norms.

This case is similar to *State v. Garrett, supra.* In *Garrett,* an intoxicated driver,

traveling only about 35 miles per hour in a 55 miles per hour zone, struck a caution sign located 4 1/2 feet from the end of a bridge and then hit the curb of the bridge. *Id.* at 625–26. The vehicle was found upside down in the water, and the passenger died at the scene. *Id.* at 625. There was nothing obstructing the bridge or preventing someone, "exercising ordinary caution or standard care, [from] approach[ing] the bridge and cross[ing] it without danger." *Id.* at 627. A jury convicted defendant of involuntary manslaughter, and on appeal, the Southern District held there was sufficient evidence to support the verdict. *Id.* at 624, 628.

In another similar case, *State v. Dagley,* 793 S.W.2d 420 (Mo.App. W.D.1990), two men parked their vehicle on the right shoulder of a two-lane highway after a wheel had fallen off. Because of the shoulder's narrowness, the driver's side of the vehicle extended about a foot into the highway's westbound lane. *Id.* at 421. While driving his truck, the defendant struck the disabled vehicle, killing the two men. The defendant's blood alcohol level was .16 percent. *Id.* at 423. After he was convicted of two counts of involuntary manslaughter, he appealed, alleging that there was not sufficient evidence of his criminal negligence. *Id.* at 424.

The *Dagley* court noted that Missouri law requires every person to operate a motor vehicle with the highest degree of care. *Id.* All drivers have the duty to "exercise unusual caution in extraordinary situations." *Id.* Because the defendant failed to notice the risk and take action to avoid hitting the disabled vehicle, this constituted "a gross deviation from the standard of care reasonable persons ... would have exercised." *Id.* at 425. The appellate court found that jurors could reasonably have found beyond a reasonable doubt that the defendant's actions constituted criminal negligence. *Id.*

In the present case, defendant's evidence showed an unusual intersection, but he had traveled through it on other occasions. The fog, which defendant argues contributed to the accident, necessitated that defendant use additional caution as to both lookout and speed. As stated in *Garrett,* a "jury could properly infer ... that in view of ... defen-

dant's intoxication his operation of the vehicle at any speed involved a substantial and unjustifiable risk of death or personal injury." *Garrett,* 829 S.W.2d at 628.

The evidence was sufficient to prove beyond a reasonable doubt that defendant was intoxicated and that he drove with criminal negligence. Defendant's point has no merit.

Judgment affirmed.

DOWD and GARY M. GAERTNER, JJ., concur.