**STATE of Missouri, Plaintiff–Respondent,**

**v.**

**Calvin Edward YARBROUGH, Defendant–Appellant.**

**No. SD 30217.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 26, 2011.

Nancy A. McKerrow, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and, John W. Grantham, Assistant Attorney

General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

Calvin Edward Yarbrough ("Defendant") was convicted after a jury trial of one count of first-degree involuntary manslaughter and three counts of second-degree assault for his involvement in an automobile collision that killed one individual and injured several others. *See* sections 565.024 and 565.060.[1] Defendant was thereafter sentenced to serve a twenty-two year term of imprisonment.

Defendant now appeals his convictions, asserting the trial court plainly erred by:

1) permitting a police officer to testify to the results of a portable breath test ("PBT"); and

2) allowing into evidence the results of blood and urine tests a hospital employee had performed as a part of Defendant's medical diagnosis and treatment because that "nullified" Defendant's refusal to allow the police to conduct such testing.

Finding no merit in either of Defendant's contentions, we affirm.

## Factual and Procedural Background

On March 25, 2009, Defendant was driving his pickup truck through an intersection near Joplin and struck a Dodge Durango traveling through the intersection in the opposite direction. The Durango, carrying four family members, spun around and landed in a nearby ditch. One of the four passengers never regained consciousness and later died from the injuries she suffered in the collision. The other three occupants suffered various minor injuries.

A commercial truck driver, Roy Butler, was behind the Durango when it entered the intersection, and he observed the collision. Butler testified that the Durango had the green light and was not speeding when it entered the intersection. Upon seeing the crash, Butler parked his truck, checked on the occupants of the Durango, then went over to Defendant, who was sitting behind the wheel of his pickup truck. Butler asked Defendant if he was alright, and Defendant said that he was.

Defendant asked to borrow Butler's cell phone but was unable to enter the number he intended to call. After an off-duty nurse arrived at the scene and dialed the number for him, Defendant told the person who answered that he "really screwed up this time, and that [he] was probably going to jail." Defendant got out of his pickup after making the phone call. Butler observed that "[Defendant] couldn't stand up real well, so he leaned up against the front of the bed in the back of the cab of the truck for balance, and stood there for a minute and got to where he could kind of get control of himself, I guess." Butler reported that he smelled an odor on Defendant that led him to believe Defendant had been drinking.

Approximately five-to-ten minutes after the collision, fire department personnel and paramedics began arriving at the scene. They observed that Defendant had a minor laceration on his forehead. Despite the laceration, these witnesses—based on their observations of Defendant and his answers to their questions—did not believe that Defendant had suffered what they referred to as any "head trauma." At one point Defendant reached for a cigarette, but a fire department engineer warned him that it was not safe to smoke because "there was a possibility of fluid leaks" from the accident. He testified that Defendant responded, "Just let me have this one cigarette." When asked by the prosecutor

---

1. Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2006.

why Defendant had said this, the engineer responded, "Because he knew he was going to jail."

Defendant was eventually transported to a hospital. The paramedics who placed Defendant in the ambulance smelled alcohol on his person, and Defendant admitted to them that he had "a little bit to drink." The paramedics also noted Defendant's slurred speech and bloodshot eyes, and testified that he appeared to be intoxicated. Defendant complained of pain to his ribs, but not about the laceration to his forehead or any other injuries.

Two officers from the Joplin Police Department contacted Defendant at the emergency room. The purpose of their contact was to determine whether Defendant was intoxicated. The officers, who were both members of the department's DWI enforcement group, arrived at the hospital roughly an hour-and-twenty-minutes after the collision had occurred and remained with Defendant for approximately one hour. The primary officer in charge, Officer Howard, observed several signs that led him to believe that Defendant was impaired, including: the odor of intoxicants, slurred speech, bloodshot eyes, and a general attitude of indifference. When Officer Howard informed Defendant that one of the occupants of the other vehicle had died, Defendant's reaction was "[o]ne of indifference, just kind of not caring, you know, just indifference. No reaction that I would expect from somebody that just found out—that had been in an accident and killed somebody."

Officer Howard also performed the horizontal gaze nystagmus test on Defendant while he laid face-up on a backboard, and Defendant exhibited six-out-of-six possible "clues" that would indicate intoxication. Officer Howard then gave Defendant a PBT, which tested "positive for alcohol." Based on the results of the horizontal gaze nystagmus test and the officers' observations of Defendant's condition, both believed Defendant was intoxicated. Officer Howard read Defendant the implied consent warning from Missouri's informed consent law and asked Defendant if he would submit to the testing of his breath, blood, urine or saliva. Defendant's response was, "No."

A medical technologist at the hospital, Christopher Feeny, tested Defendant's blood and urine for purposes of medical treatment and diagnosis. Feeny testified that Defendant's urine sample tested positive for marijuana, and the blood test revealed a blood alcohol level of 0.25 percent. Because Feeny had no personal contact with Defendant, he had no opportunity to observe whether Defendant displayed any signs of impairment. Defendant's hospital records indicating the test results were also admitted into evidence as business records. Defendant did not present any evidence.

## Standard of Review

Defendant acknowledges that he failed to object at trial to the introduction of any of the evidence about which he now complains. As a result, Defendant requests plain error review under Rule 30.20.[2] That rule provides that "plain errors affecting substantial rights" may be considered in the discretion of the appellate court "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id.; State v. Golden,* 221 S.W.3d 444, 446 (Mo.App. S.D.2007). Plain error review should be used "sparingly" and is limited to addressing " 'error that is evident, obvious and clear.' " *State v. Campbell,* 122 S.W.3d 736, 739–40 (Mo. App. S.D.2004) (quoting *State v. White,* 92

**2.** Unless otherwise indicated, all rule references are to Missouri Court Rules (2010).

S.W.3d 183, 189 (Mo.App. W.D.2002)). "A defendant must not only show prejudicial error occurred, but must also show that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error were to be left uncorrected." *State v. Deckard*, 18 S.W.3d 495, 497 (Mo.App. S.D.2000). In regard to a direct appeal, manifest injustice has occurred only if the error was "outcome determinative." *Campbell*, 122 S.W.3d at 740.

### Analysis

Defendant's single point relied on states: The trial court plainly erred in allowing Officer Shelby Howard to testify to the results of a [PBT] he administered to [Defendant] and in allowing Christopher Feeny to testify to the results of the blood and urine tests he performed because the testimony of those two witnesses deprived [Defendant] of his right to due process and to counsel as guaranteed by the U.S. Constitution, Amendments VI and XIV, and the Missouri Constitution, Article I, §§ 10 and 18(a) in that Howard took the [PBT] before informing [Defendant] of the "implied consent" warnings, [Defendant] asked for an attorney but was not given the opportunity to contact one, and when given the implied consent warnings, [Defendant] refused to be tested and yet the State nullified his refusal by introducing the testing Feeny performed as part of [Defendant]'s treatment and diagnosis.

■ The State is correct in asserting that Defendant's single point improperly raises multiple claims and legal issues, and that such multifarious points are subject to dismissal under Rule 84.04(d) as leaving nothing for appellate review. *State v. Marrone*, 292 S.W.3d 577, 579 (Mo.App.

S.D.2009). Despite the rule violation, Defendant's claims are easily discernable. "While arguments which violate Rule 84.04 are not required to be reviewed by this Court, we have chosen to review Defendant's points *ex gratia.*" *State v. Taylor*, 166 S.W.3d 599, 604 n. 2 (Mo.App. S.D. 2005).

A request for plain error review triggers the commencement of a two-step analysis by an appellate court. *See State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App. 1999). The first step of this analysis is to determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred. *State v. Rhodes*, 988 S.W.2d 521, 526 (Mo. banc 1999); *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). If facially substantial grounds are found to exist, the appellate court should then move to the second step of this analysis and engage in plain error review to determine whether manifest injustice or a miscarriage of justice has actually occurred. *See State v. Rogers*, 51 S.W.3d 879, 880 (Mo.App.2001). If facially substantial grounds are not found to exist, the appellate court should decline to exercise its discretion to review the claim of plain error pursuant to Rule 30.20. *Id.*; *State v. East*, 976 S.W.2d 507, 509–10 (Mo.App.1998). *Campbell*, 122 S.W.3d at 740. We will examine the two evidentiary matters identified by Defendant to see whether either alleged error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice has occurred.[3]

### # 1: The Portable Breath Test

■ Defendant claims the trial court plainly erred in admitting the "results of a

---

**3.** To the extent that the point could also be read as an attempt to assert a claim of ineffec-

tive assistance of counsel on direct appeal, we simply disregard it.

[PBT]" because it was administered after he asked for an attorney but was not given one, and it was given before Officer Howard had read Defendant the implied consent warning pursuant to section 577.041.1. If these objections had been made to the trial court, it could properly have overruled them as meritless.

■ First, Defendant has no constitutional or statutory right to consult with an attorney before submitting to a PBT. It is well settled that, absent a statutory right, an arrested person, let alone someone one who has not yet been arrested, "has no constitutional right to speak with an attorney prior to deciding whether . . . to submit to a breathalyzer test[.]" *Christensen v. Director of Revenue*, 128 S.W.3d 171, 175 (Mo.App. S.D.2004); *Witeka v. Director of Revenue*, 913 S.W.2d 438, 440 (Mo.App. E.D.1996).

Defendant also had no statutory right to speak with an attorney prior to being given the PBT. The implied consent law, contained in section 577.020, states in part: "Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent to, subject to the provisions of sections 577.019 to 577.041, a chemical test or tests of the person's breath, blood, saliva, or urine. . . ." Section 577.020.1.[4]

■ Under section 577.041.1, "If a person when requested to submit to any test allowed *pursuant to section 577.020* requests to speak to an attorney, the person shall be granted twenty minutes in which

to attempt to contact an attorney." (Emphasis added). Consequently, the right to have twenty minutes in which to contact an attorney prior to submitting to a breath test applies only to tests given under section 577.020. PBTs administered pre-arrest (used to establish probable cause), like the one given to Defendant by Officer Howard, are not considered "tests" for purposes of section 577.020. *Baker v. Director of Revenue*, 945 S.W.2d 589, 590 (Mo.App. E.D.1997).

Pre-arrest PBTs are governed instead by section 577.021, which allows officers, prior to arrest, to administer a chemical test to a person suspected of driving while intoxicated. Section 577.021.1; *State v. Morgenroth*, 227 S.W.3d 517, 521–22 (Mo. App. S.D.2007).[5] Section 577.021.3 specifically states that "[t]he provisions of sections 577.019 and 577.020 shall not apply to a test administered prior to arrest pursuant to this section." Because the PBT given to Defendant fell outside the scope of section 577.020, he had no statutory right to consult with an attorney before taking the test.

■ Second, it was not necessary that Defendant be given the implied consent warning before the PBT was administered. The implied consent warning is mandated by section 577.041.1 and requires that certain information be provided to an arrestee who is requested to submit to a chemical test pursuant to section 577.020. *Mayfield v. Director of Revenue*, 100 S.W.3d 847, 850 (Mo.App. S.D.2003). "The request of the officer shall include the reasons of the

---

4. "The statute's central feature is that any person who drives on the public highways is deemed to have consented to a chemical test to determine the alcohol or drug content of the person's blood." *Hinnah v. Director of Revenue*, 77 S.W.3d 616, 619 (Mo. banc 2002).

5. In *Morgenroth*, unlike the instant case, defense counsel objected to any reference to the PBT as "not admissible as evidence of intoxication." 227 S.W.3d at 520. The court erroneously overruled this proper objection and the State then argued in its closing that the defendant had "failed" the PBT and that that failure constituted evidence that the defendant was intoxicated. *Id.* at 520–21.

officer for requesting the person to submit to a test and ... that the person's license shall be immediately revoked upon refusal to take the test." Section 577.041.1. Because, as noted above, a PBT is not subject to section 577.020, Officer Howard was not required to read Defendant the implied consent warning prior to administering it. The trial court would not have erred, plainly or otherwise, in overruling an objection made on the grounds now asserted on appeal.

Finally, even if Defendant had alleged that the PBT was objectionable because it constituted inadmissible evidence of intoxication, no prejudice resulted because the PBT was "cumulative and not highlighted." *State v. Foster*, 244 S.W.3d 800, 803 (Mo. App. S.D.2008). Officer Howard merely testified that the results of the test were "positive" for alcohol, and this fact was not mentioned again during the trial. This fleeting, non-specific testimony was dwarfed by the testimony of several witnesses who testified that Defendant exhibited various signs of intoxication, as well as Defendant's own admission to an officer that he had been drinking. As a result, even if a proper objection had been raised and improperly overruled, no prejudice would have resulted, and without clear error affecting a defendant's substantial rights, there can be no plain error.

### # 2:  Results of Medical Tests of Defendant's Blood and Urine

▮ Defendant also claims his due process rights were violated when a medical technologist at the hospital was allowed to testify to the results of blood and urine tests administered to Defendant for purposes of determining Defendant's diagno-

sis and treatment. Defendant bases his argument on sections 577.020 to 577.041, which set forth certain standards and procedures "for procuring admissible evidence of blood alcohol for use against persons operating automobiles while intoxicated." *Hinnah*, 77 S.W.3d at 619. Defendant argues these provisions provide the exclusive method of admitting evidence of chemical testing to prove intoxication. He contends the State, by arguing in closing that Defendant's refusal to submit to the testing of his blood after being read the implied consent warning should be used by the jury as evidence that Defendant "knew he was going to test as high as he did at the hospital[,]" "used Chapter 577 to punish [Defendant] ... but it got around Chapter 577 by having Christopher Feeny testify concerning the blood alcohol of the blood serum he tested at St. John's Hospital." [6]

In a similar case, *State v. Todd*, 935 S.W.2d 55 (Mo.App. E.D.1996), the defendant, who was driving while intoxicated, appealed convictions of involuntary manslaughter and second-degree assault. The defendant there, as here, incurred his convictions as a result of his involvement in an alcohol-related car crash that resulted in fatalities. *Id.* at 56. *Todd*, like Defendant, claimed the trial court erred in admitting the results of a blood alcohol test performed by hospital personnel, alleging the hospital's testing procedures did not comply with Chapter 577. *Id.* at 58. The Eastern District affirmed Todd's convictions, holding that "[a]ccording to the plain language of the statute and regulations, the requirements and protection provided by the implied consent law do not apply to all blood tests offered as evidence but only those offered pursuant to Chapter 577."

---

**6.** Section 577.041.1 provides that if any person under arrest refuses to submit to testing pursuant to section 577.020, then "evidence of the refusal shall be admissible in a proceeding pursuant to section ... 565.060[.]"

*Id.* at 59; *see also State v. Smith,* 134 S.W.3d 35, 37–38 (Mo.App. E.D.2003) (citing *State v. Waring,* 779 S.W.2d 736, 740–41 (Mo.App. S.D.1989)).

In *Smith,* the court noted that the implied consent provisions in Chapter 577 were "enacted to codify the procedures under which a law enforcement officer could obtain bodily fluids for testing by consent without a search warrant," and they are "directed only to warrantless tests authorized by law enforcement officers[.]" *Smith,* 134 S.W.3d at 40. "[I]n cases not involving warrants, our courts have recognized that Chapter 577 is not the exclusive means to obtain chemical test results for use as evidence in a criminal trial." *Id.* at 38.

The plain language of sections 577.020 to 577.041 supports the holdings in *Todd* and *Smith.* Section 577.020 directs the procedures that are to be followed by law enforcement officers when testing a driver's breath, blood, saliva, or urine to determine blood alcohol content. "The test *shall be administered at the direction of the law enforcement officer* whenever the person has been arrested or stopped for any reason." Section 577.020.1 (emphasis added). Similarly, the requirements for the performance of blood alcohol tests under section 577.029 apply only to medical personnel "acting at the request and direction of the law enforcement officer[.]" *Todd,* 935 S.W.2d at 59 (quoting section 577.029, RSMo 2000).

Most importantly, section 577.037.3 directs that the implied consent law "shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was intoxicated." While it is true that section 577.037.4 limits the use of chemical tests to establish a *presumption of intoxication* to those tests performed in accordance with Chapter 577, section 577.037.3

expressly declines to limit the admissibility of other evidence relevant to the issue of intoxication.

Although Defendant asserts *Todd* was wrongly decided, he offers no legal authority to support his claim. We believe *Todd* correctly interpreted and applied the statutory provisions at issue. As a fallback position, Defendant claims *Todd* may be distinguished from the instant case because, in *Todd,* the State offered the defendant's hospital test result under the business records exception to the hearsay rule when the law enforcement officers involved never attempted to obtain a sample of Todd's blood under Chapter 577. We find this distinction unimportant as Defendant's lawful refusal to allow Officer Howard to test his blood for law enforcement purposes had no bearing on the right of hospital personnel to test Defendant's blood alcohol level for purposes of medical treatment and then testify about those results at trial.

The central holding of *Todd*—that the implied consent law is not the only way to introduce chemical testing to show intoxication—is directly applicable to Defendant's case. There was no evidence that the medical technologist withdrew Defendant's blood and urine for testing at the request or direction of law enforcement. As a result, the test results now challenged by Defendant were not obtained or admitted under Chapter 577. Because there are other valid means by which blood or urine test results may be introduced into evidence, the State's use of one of them in the instant case did not amount to "getting around" the requirements of Chapter 577.

Apart from arguing that the results of the hospital's testing of Defendant's blood were introduced in violation of the implied consent law, Defendant does not otherwise challenge the admissibility of the evidence. The trial court also did not err, plainly or

otherwise, in admitting the results of the hospital's testing of Defendant's blood and urine. Because no facial appearance of manifest injustice appears, no further plain error review is necessary, and the judgment of the trial court is affirmed.

BARNEY, P.J. and LYNCH, J., Concur.