

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100156 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the City of St. Louis |
| | ) | Circuit Court |
| vs. | ) | |
| | ) | Honorable Thomas C. Grady |
| THERESA FORTNER, | ) | |
| | ) | Filed: October 7, 2014 |
| Defendant/Appellant. | ) | |

## Introduction

Theresa Fortner (Defendant) appeals from the judgment entered upon her convictions following a bench trial for second-degree felony murder, first-degree endangering the welfare of a child, and armed criminal action. Defendant was sentenced as a prior and persistent offender to concurrent terms totaling twelve and one-half years' imprisonment. On appeal, Defendant challenges the seizure of a blood sample obtained by law enforcement, the admission of her blood alcohol test results, and the sufficiency of the evidence to support her convictions for child endangerment and armed criminal action. We affirm.

**Factual Background**

Viewed in the light most favorable to the State, the evidence shows that around 9:00 a.m., on July 4, 2011, Defendant was sitting in her car with her 19-month-old granddaughter, B.H., in the parking lot of her apartment complex in Arnold, Missouri. Defendant called her sister, Jennifer Outlaw, and said that she had been up since 5:00 a.m. and that B.H. was in the car. Defendant also told Outlaw that she had been drinking. Outlaw told Defendant not to drive and to take B.H. back to the apartment and give her to C.H. (B.H.'s mother).[1] At that point, Defendant ended the conversation and proceeded to drive her Toyota Camry, with B.H. in the back seat, onto I-55 highway heading northbound toward St. Louis. At approximately 9:15 a.m., Defendant exited the highway at Loughborough Avenue and lost control of the car. The car struck a deflector, a one-way street sign, a tree, and then crossed through a residential yard before colliding into a brick house and landing "flipped up" and backwards against a tree. An eyewitness reported that the Camry was traveling at such a high rate of speed that two of its wheels were off the ground as it was coming off the highway exit. Both Defendant and B.H. were seriously injured and transported to the hospital. B.H. died the next day as a result of the injuries she sustained in the accident. Data recovered from the Camry's air bag control module showed that in the 4.4 seconds before the air bags deployed, Defendant accelerated from approximately 65 mph to over 67 mph and the brakes were never applied. Police also found four empty wine bottles in the car following the accident.

---

[1] The record indicates that the child and her mother were residing with Defendant at the time.

Defendant arrived at the hospital at approximately 9:52 a.m. In accordance with an order issued by the treating physician at 10:29 a.m., medical personnel drew two blood samples from Defendant. One sample was taken to the hospital lab while the second sample remained in the emergency room. Shortly after the accident, Officer Todd Grimes, a St. Louis police officer, who had initially responded to the scene of the accident, was sent to the hospital to speak with Defendant. Officer Grimes read Defendant the *Miranda*[2] warnings, as well as the provisions of Missouri's "implied consent" law, § 577.020, RSMo.[3] After indicating that she understood, Defendant gave her consent for the officer to obtain a blood sample to determine her blood alcohol level. Due to the condition of Defendant's veins as a result of receiving a blood transfusion, medical personnel were unable to draw an additional blood sample from Defendant. Instead, Officer Grimes was given Defendant's previously drawn blood sample that was still in the emergency room. Officer Grimes took the blood sample to the police lab and it was sent to the toxicology lab for testing on July 6, 2011. A gas chromatography test conducted on the blood sample revealed that Defendant's blood alcohol content was .226 percent, more than twice the legal limit.

Defendant was subsequently charged by substitute information in lieu of indictment with second-degree felony murder, and, in the alternative, first-degree involuntary manslaughter, armed criminal action based on the felony murder charge, and,

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[3] Section 577.020 provides that any person who drives on the public highways is deemed to have consented to a chemical test to determine the alcohol or drug content of their blood under certain circumstances, including if the person operating the motor vehicle was involved in a collision that resulted in a fatality of serious physical injury. All statutory references are to the Missouri Revised Statutes (Supp. 2010), unless otherwise indicated.

in the alternative, armed criminal action based on the involuntary manslaughter charge, and first-degree endangering the welfare of a child. Defendant waived her right to a jury trial and filed a motion to suppress the results of her blood alcohol test, which the trial court overruled. At trial, the blood test results were admitted into evidence over objection. Defendant was found guilty of second-degree felony murder, first-degree endangering the welfare of a child, and armed criminal action, and sentenced to concurrent terms totaling twelve and one-half years' imprisonment. Defendant filed a motion for new trial, which was denied. Defendant now appeals.

### *Point I: Motion to Suppress Blood Test Results*

In her first point, Defendant contends that the trial court erred by overruling the motion to suppress the results of her blood alcohol test, and objections to its admission at trial, because her blood sample was collected for "medical purposes" and its seizure by a law enforcement officer violated her constitutional rights against unreasonable searches and seizures.[4] Specifically, Defendant complains that Officer Grimes did not obtain a warrant or her consent before seizing the blood sample.

In reviewing a trial court's ruling on a motion to suppress, our inquiry is limited to determining whether the decision is supported by substantial evidence, and we will reverse the ruling only if it is clearly erroneous. *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004). The trial court's ruling is clearly erroneous if we are left with a definite and firm belief that a mistake has been made. *State v. Leavitt*, 993 S.W.2d 557, 560 (Mo.

---

[4] Defendant cites the Fourth and Fourteenth Amendments to the United States Constitution and art. I, § 15 of the Missouri Constitution.

App. W.D. 1999). "We consider the evidence presented at the pretrial hearing, as well as any additional evidence presented at trial." *State v. Dillard*, 158 S.W.3d 291, 297 (Mo. App. S.D. 2005). The evidence is viewed in the light most favorable to the trial court's ruling. *Id*. We defer to the trial court's factual findings and credibility determinations, but we review questions of law *de novo*. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

In her motion to suppress, Defendant claimed that although she "impliedly consented" to having her blood drawn by medical personnel while being treated for her injuries, that consent was "limited" to use for medical purposes only. Defendant further claimed that she had a "privacy interest" with respect to the blood sample. At the hearing on the motion to suppress, defense counsel asserted that because the blood sample was obtained based on Defendant's implied consent, a warrant or her additional consent was required before the blood sample could be lawfully seized.

In support of this contention, Defendant relies on *State v. Copeland*, 680 S.W.2d 327 (Mo. App. S.D. 1984). Defendant's reliance on that case is misplaced. In *Copeland*, the Court addressed the issue whether an unconscious person's implied consent to receive medical treatment following an accident, which included a blood sample being drawn by hospital personnel for medical purposes, was protected by the "physician-patient privilege." *Id*. at 329; *see* § 491.060 (5), RSMo 1978. The Court specifically held that the law in effect at the time the defendant's blood was taken prevented the blood test results from being used against him in a criminal proceeding. *Id*.

5

Subsequent to *Copeland*, the legislature enacted § 577.037, which creates an exception to the physician-patient privilege with respect to the admissibility of blood alcohol test results in proceedings involving alcohol-related driving offenses.[5] In addition, the Court in *Copeland* specifically noted that there was no probable cause to believe that the defendant had committed an alcohol-related offense because no alcoholic containers were found in the defendant's vehicle and there was no evidence of improper driving. *Id*. at 331. By contrast, in this case, the officers found empty wine bottles in Defendant's car after the accident and an eyewitness reported that Defendant was driving at such a high rate of speed coming off the exit that two of the car's wheels left the ground. Further, the evidence demonstrated that Defendant did not apply the car's brakes while exiting the highway, and instead, accelerated, striking several objects before plowing through a yard and colliding into a house. Moreover, in overruling Defendant's motion to suppress the blood test results, the trial court found that *Copeland* did not apply to the facts of this case, in part, because the State's theory was not based on "implied consent," but rather that Defendant voluntarily consented to having her blood tested.

A similar issue was addressed by this Court's Southern District in *State v. Waring*, 779 S.W.2d 736, 739 (Mo. App. S.D. 1989). In that case, the defendant was charged with involuntary manslaughter after driving his truck while intoxicated and causing an accident that resulted in a fatality. On appeal, the defendant challenged the admissibility

---

[5]Section 577.037.1 provides that, "[u]pon the trial of any person for violation of any of the provisions . . . or upon the trial of any criminal action ... arising out of acts alleged to have been committed by any person while driving a motor vehicle while in an intoxicated condition, the amount of alcohol in the person's blood at the time of the act alleged as shown by any chemical analysis of the person's blood, breath, saliva or urine is admissible in evidence and the provisions of subdivision (5) of section 491.060, RSMo, [the physician-patient privilege] shall not prevent the admissibility or introduction of such evidence if otherwise admissible." *State v. Moore*, 128 S.W.3d 115, 118 (Mo. App. E.D. 2003).

6

of his blood alcohol test results, claiming that he had a "privacy interest" in his blood sample drawn for "medical purposes" that was protected by the "physician-patient" privilege, and therefore, the results of a blood alcohol test conducted on the blood sample were inadmissible. *Id.* at 739-40. The defendant also claimed that because the blood test was not obtained pursuant to the provisions of the implied consent law, the test results were inadmissible. *Id.* at 740. In rejecting these arguments, the Court found that the defendant's blood sample was not protected by the physician-patient privilege because § 577.037.1 provides an exception to the privilege and allows the admission of blood alcohol test results regardless of the circumstances under which they are obtained, so long as otherwise admissible. *Id.* at 740. Although the blood alcohol test results in *Waring* were ultimately seized under a warrant, as opposed to express consent, we find the Court's reasoning instructive with regard to the admissibility of the test results, notwithstanding that the tests were done on blood samples drawn for "medical purposes" and at the direction of a physician, rather than law enforcement.

Defendant presents a similar argument on appeal, claiming that because the blood sample obtained by Officer Grimes had been previously drawn as part of her medical treatment, and not at the request of a law enforcement officer in accordance with the implied consent law, the blood alcohol test results were inadmissible. Defendant further contends that the consent given to Officer Grimes was limited to a "future" blood sample. Although Defendant repeatedly references the implied consent provisions as a basis for her argument, whether Defendant "impliedly consented" to having a blood sample taken for testing is not the dispositive issue here. As the State correctly points out, Defendant

7

*expressly consented* to Officer Grimes's request to obtain a blood sample for the purpose of determining her blood alcohol content. Thus, the question here is whether Defendant placed any limitations on her consent and whether the seizure of the blood sample exceeded the scope of that consent.

While the taking of a blood specimen has been held to be a search and seizure within the meaning of the Fourth Amendment, there are exceptions to the warrant requirement. *See Schmerber v. California*, 384 U.S. 757, 767 (1966); *see State v. Middleton*, 43 S.W.3d 881, 885 (Mo. App. S.D. 2001). An exception to the warrant requirement is consent. *See Middleton*, 43 S.W.3d at 885. "A consensual search conducted without a search warrant does not violate the Fourth Amendment, even though the search is not otherwise supported by probable cause or a reasonable suspicion of criminal activity." *Id*. Consent must be freely and voluntarily given by a person with the authority to consent and the search must not exceed the scope of the consent given. *Id.*

In this case, Officer Grimes testified that shortly after arriving at the hospital, he spoke with Defendant in the emergency room and requested a blood sample to conduct a blood alcohol analysis. After Office Grimes read the *Miranda* warnings, as well as the implied consent provisions, Defendant voluntarily gave her consent for him to obtain a blood sample for testing. The emergency room nurse on duty at the time, Earline Shepherd, testified that because Defendant had received a blood transfusion after the accident and her veins were not in adequate condition to draw another sample, Officer Grimes was provided with the blood sample previously drawn by medical personnel that was still in the emergency room. After obtaining the blood sample, Officer Grimes

8

packaged it in an evidence bag, transported it to the police lab, and then sent it to the toxicologist for a chemical analysis. The test results revealed that Defendant's blood alcohol content level was .226 percent, well over twice the legal limit.

The record clearly shows that Defendant expressly consented to the testing of her blood. Once Defendant voluntarily agreed to provide a blood sample for this purpose, Officer Grimes was entitled to obtain the blood sample and have it tested. This is true even though the blood sample had been previously drawn for "medical purposes."[6] Moreover, due to the blood transfusion that Defendant received, this was the only blood sample available for testing. There was no evidence demonstrating that Defendant placed any limitation on her consent. Nor does the record reflect that Defendant specified that the chemical analysis could only be performed on a "future" blood sample. Under these circumstances, it would be illogical to require an officer, after a defendant has expressly consented to a blood alcohol test, to obtain a warrant or additional consent. Thus, the fact that the request was made after the blood was drawn does not mandate a different result. The trial court correctly denied Defendant's motion to suppress. Point I is denied.

### Point II: Admission of Blood Test Results

In her second point, Defendant contends that the trial court erred by admitting her blood test results because the State failed to comply with the applicable methods and techniques under Chapter 577 and the procedures approved by the state health

---

[6] The results of blood alcohol tests conducted on blood samples collected for medical purposes have been upheld as admissible by several other jurisdictions. *See, e.g., State v. Davis*, 12 A.3d 1271, 1276-77 (N.H. 2010); *People v. Elysee*, 904 N.E.2d. 813 (N.Y. App. 2009); *Ramos v. State*, 124 S.W.3d 326 (Tex. App. 2003*); Commonwealth of Pennsylvania v. Seibert*, 799 A.2d 54 (Pa. Super. 2002); *Lind v. Superior Court*, 954 P.2d 1058, 1062 (Ariz. 1998); *State v. Smith*, 929 P.2d 1191, 1196-97 (Wash. App. 1997); *Tims v. State*, 711 So.2d 1118 (Ala. Crim. App. 1997); *State v. Oakley*, 469 N.W.2d 681, 682-83 (Iowa 1991); *People v. Perlos*, 462 N.W.2d 310, 330 (Mich. 1990); *State v. Jenkins*, 259 N.W.2d 109 (Wis. 1977).

department.  Specifically, Defendant complains that: (1) the blood sample was not drawn at the request of a law enforcement officer; (2) the sample was not collected in a sterile collection tube containing a preservative and anticoagulant; and (3) the blood sample was not otherwise obtained in strict accord with accepted medical practices.  The State responds that the trial court properly admitted the blood test results because the evidence and testimony presented at trial established that the proper procedures were followed for conducting the chemical analysis of Defendant's blood.

The trial court has broad discretion with regard to the admission or exclusion of evidence and we will not overrule its decision absent an abuse of discretion.  *State v. Jordan*, 181 S.W.3d 588, 594 (Mo. App. E.D. 2005).  An abuse of discretion occurs when the ruling is "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id*.

Sections 577.020 through 577.041 (the implied consent provisions) set forth certain standards and procedures for procuring admissible evidence of a driver's blood alcohol content for use at trial.  *State v. Yarbrough*, 332 S.W.3d 882, 888 (Mo. App. S.D. 2011).  In accordance with these provisions, the proponent of a blood alcohol test must meet certain foundational prerequisites as set forth in § 577.029, and the applicable department of health regulations.  *Mayridis v. Director of Revenue*, 155 S.W.3d 775, 778 (Mo. App. E.D. 2005); *see* 19 C.S.R. § 25-30.070.  Section 577.029 requires that a licensed physician, registered nurse, or trained medical technician, acting at the request and direction of a law enforcement officer, withdraw the blood for the purpose of determining the blood alcohol content, and that a previously unused sterile needle and

10

sterile container be used, and that the withdrawal of blood must otherwise be in strict accord with accepted medical practices. *See Ziegler v. Director of Revenue*, 369 S.W.3d 759, 760 (Mo. App. S.D. 2012).

As noted by this Court in *State v. Smith*, the implied consent provisions of Chapter 577 were enacted to codify the procedures under which a law enforcement officer could obtain a driver's blood sample for testing without a warrant to determine the blood alcohol content for use as evidence of intoxication. 134 S.W.3d at 40. The implied consent provisions apply only to the results of blood alcohol tests offered as evidence pursuant to Chapter 577. *See Yarbrough*, 332 S.W.3d at 889 (Mo. App. S.D. 2011) (citing *State v. Todd*, 935 S.W.2d 55, 59 (Mo. App. E.D. 1996)). In cases not involving warrants, our courts have recognized that Chapter 577 is not the exclusive means to obtain alcohol test results for use as evidence of intoxication in a criminal proceeding. *See Smith*, 134 S.W.3d at 38; *Waring*, 779 S.W.2d at 740-41 (citing *Schmerber v. California*, 384 U.S. 757 (1966)).

Here, the State did not offer the blood alcohol test results pursuant to the implied consent provisions, but rather based on Defendant's express consent to have her blood tested. In any event, the record shows that appropriate standard medical procedures were followed. Shepherd's testimony established that either she or another licensed emergency room technician collected two blood samples from Defendant after her arrival at the hospital. Shepherd testified that standard medical procedures would have been followed to obtain Defendant's blood sample by using a sealed, unused sterile needle, a sterilized syringe, and a sterile collection tube. Shepherd also confirmed that the same

standard medical practices would have been followed regardless of whether Defendant's blood was drawn for purposes of medical treatment or at the direction of a law enforcement officer.

As previously noted, at Officer Grimes's request, Defendant voluntarily agreed to provide a blood sample for testing her blood alcohol content. Because Defendant had received a blood transfusion, Officer Grimes was given the previously drawn blood sample that was still in the emergency room. The blood sample was packaged in an evidence bag, taken to the police lab, and sent to the toxicologist for testing.

Dr. Christopher Long, the chief toxicologist for St. Louis County, testified that he received Defendant's blood sample at 11:30 a.m. on July 6, 2011, and that he tested and re-tested the sample. Dr. Long said the test was performed by a gas chromatography and that the test results revealed that Defendant's blood alcohol content was .226 percent, over twice the legal limit. Dr. Long also said there was no evidence of decomposition and therefore the fact that the blood sample had been briefly unrefrigerated did not affect or discount the test results. He also indicated that the use of an isopropanol alcohol swab would not have interfered with the chromatography test results. Dr. Long testified that an anticoagulant was properly found in the blood sample and that it could thus be inferred that a preservative was also contained in the sample. He also testified that the blood test results revealed that the amount of alcohol that a person of Defendant's size would have consumed was equivalent to a minimum of "8-9 four-ounce glasses of wine" or "eight to nine 12-ounce cans of beer."

12

Based on our review of the record, the evidence established that the proper standard medical procedures were followed and that the blood sample was obtained in accordance with accepted medical practices.  While the blood sample was not drawn at the request of a law enforcement officer acting under the provisions of § 577.020, the record indicates that the blood test was performed in accordance with the applicable approved methods.  Under these circumstances, the trial court did not abuse its discretion by admitting the test results.  Point II is denied.

### Point III:  First-Degree Child Endangerment

In her third point, Defendant claims the evidence was insufficient to support her conviction for first-degree child endangerment, the predicate felony to her second-degree murder conviction.[7]  Specifically, Defendant contends that the evidence did not establish that she acted "knowingly" in creating an actual risk to B.H.'s life, body, or health, or that she was aware of the nature of her conduct or attendant circumstances.

Appellate review of the sufficiency of the evidence in a court-tried criminal case is based upon the same standard as in a jury-tried case.  *State v. Holman*, 230 S.W.3d 77, 82 (Mo. App. S.D. 2007).  Our review is limited to a determination of whether there was sufficient evidence from which the trier of fact could find that the defendant was guilty beyond a reasonable doubt.  *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993).  We accept as true all of the evidence favorable to the State, including all favorable inferences

---

[7] As Defendant does not separately dispute the sufficiency of the evidence to support her second-degree felony murder conviction, we do not address it.

13

drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Gibbs*, 306 S.W.3d 178, 181 (Mo. App. E.D. 2010).

Missouri's child endangerment statute provides that:

A person commits the crime of first-degree endangering the welfare of a child if the person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old.

Section 568.045.1(1).

A person "acts knowingly," or "with knowledge," (1) "[w]ith respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." Section 562.016.3

Here, the substitute information in lieu of indictment filed by the State stated as follows:

[O]n or about July 4, 2011, in the City of St. Louis, State of Missouri, the defendant knowingly acted in a manner that created a substantial risk to the life and body and health of B.H., a child less than seventeen years old, by driving her vehicle in which B.H. was a passenger at excessive rates of speed, with a high level of intoxication, and failing to brake as she exited I-55.

In order to prove Defendant committed first-degree child endangerment, the State was required to establish that: (1) Defendant engaged in conduct; (2) that created a substantial risk to the life, body, or health of B.H.; (3) B.H. was less then seventeen years old; and (4) Defendant acted knowingly with respect to the facts and circumstances. *State v. Osborn*, 318 S.W.3d 703, 712 (Mo. App. S.D. 2010). "[T]here must be an actual, as opposed to a potential risk, to the life, body, or health of the child." *State v. Burrell*,

14

160 S.W.3d 798, 802 (Mo. banc 2005). Section 568.045.1(1) does not require that the child sustained severe injuries to support a conviction for child endangerment, but rather that the act(s) of the defendant created a substantial risk of harm to the child. *Osborn*, 318 S.W.3d at 712.

There is no bright-line test for determining whether a person acts "knowingly" in a manner that creates a substantial risk to the life, body, or health of a child. *Burrell*, 160 S.W.3d at 802. In making this determination, we must look to the totality of the circumstances. *Id*. A defendant's knowledge may be proven by direct or circumstantial evidence and reasonable inferences drawn from the circumstances surrounding the incident. *State v*. *Hopson*, 168 S.W.3d 557, 563 (Mo. App. E.D. 2005). In addition to the circumstantial evidence and reasonable inferences drawn from the surrounding facts, "[a] defendant's mental state may be reasonably inferred from the act itself." *State v. Rinehart*, 383 S.W.3d 95, 103 (Mo. App. W.D. 2012) (citation omitted).

Here, Defendant claims that she lacked the requisite mental state to be charged with first-degree child endangerment because she had "no recollection" of what caused the accident or the events leading to the accident. Defendant also claims the evidence did not show that she "knowingly" caused the vehicle to lose control when she exited the highway. Defendant maintains that because B.H. was "properly restrained" in a car seat in the back seat of the vehicle, and because Defendant had driven to a local Wal-Mart earlier that day "with no difficulty," that the evidence supports a "less culpable state of mind." For these reasons, Defendant contends that the State should have charged her

with second-degree child endangerment[8] (a misdemeanor), instead of felony child endangerment. We disagree.

As the State points out, Defendant fails to recognize the distinction between her *acts* on the one hand, and the *risk* created by her actions on the other. Although the State was required to prove that Defendant's act(s) created a substantial risk of harm to B.H., the State was not required to elaborate on all the risks that might flow from the Defendant's conduct. *See State v. Todd*, 183 S.W.3d 273, 277 (Mo. App. W.D. 2005).

Contrary to Defendant's assertions, there was ample evidence presented at trial from which the trier of fact could find that Defendant was aware of the nature of her conduct or the attendant circumstances that created a substantial risk of harm to B.H. when she drove her car while intoxicated at an excessive speed on the day of the accident. Outlaw testified that Defendant made frequent trips to her home that required her to travel northbound on I-55 highway and onto the Loughborough exit. From this testimony, it could be inferred not only that Defendant was familiar with the route traveled that day, but also with the configuration of the exit, as well as the speed restrictions. Defendant knew that her granddaughter was in the car because Defendant mentioned it to Outlaw during their phone conversation just a few minutes before Defendant drove her Camry onto the highway. Defendant also told Outlaw that she had been drinking. Outlaw specifically instructed Defendant not to drive and to take B.H. back inside the apartment and return the child to her mother.

___

[8] Section 568.050.1(5) criminalizes the conduct of driving while intoxicated with a child under the age of 17 present in the vehicle.

16

Based on the evidence and the totality of the circumstances, we find there was sufficient evidence from which the trier of fact could find that Defendant knowingly engaged in conduct that created a substantial risk to B.H.'s life, body, or health when she drove her car while intoxicated, with B.H. as a passenger, onto the highway, then onto an exit ramp, at a high rate of speed, beyond the posted speed limit, without applying the brakes, and striking several objects before crashing into a house. Defendant chose to drive while intoxicated despite being warned not to drive and to return B.H. to her mother. That Defendant could not later recall the events leading to the accident when speaking with police following the accident is immaterial. The question here is not whether Defendant could remember what caused the accident, but whether the evidence showed that Defendant was aware of the nature of her conduct or attendant circumstances at the time and knowingly engaged in conduct that created a substantial risk of harm to B.H. Based on the record before us, we find there was sufficient evidence to show that Defendant was aware of the nature of her conduct and the circumstances when she drove her car while intoxicated, onto the highway, at a high rate of speed, then onto an exit ramp without applying the brakes. Accordingly, we find the evidence was sufficient to support Defendant's conviction for first-degree child endangerment. Point III is denied.

### Point IV: Armed Criminal Action

In her final point, Defendant claims the trial court erred by finding her guilty of armed criminal action because the evidence was insufficient to prove that she committed second-degree murder "by, with, and through the knowing use, assistance and aid of a

17

dangerous instrument."[9]  Specifically, Defendant complains that the State did not present sufficient evidence to prove that she "knowingly" used her car as a "dangerous instrument" to commit second-degree felony murder.  We disagree.

Section 571.015.1 provides that:

> Any person who commits *any felony…by, with, or through the use, assistance, or aid of a dangerous instrument* or deadly weapon is also guilty of the crime of armed criminal action." [Emphasis added].

A "dangerous instrument" is defined as "any instrument, article, or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury."  Section 556.061(9).  A "dangerous instrument" can be virtually any item.  The types of objects that may constitute "dangerous instruments" are not enumerated by statute and become "dangerous instruments" when used in a manner where the object is readily capable of causing death or serious physical injury.  *State v. Payne*, 250 S.W.3d 815, 819 (Mo. App. W.D. 2008).  A car can be a dangerous instrument when used in circumstances where it is readily capable of causing death or serious injury.  *See State v. Williams*, 126 S.W.3d 377, 382 (Mo. banc 2004).

While an armed criminal action charge requires proof that a defendant "acted purposely" or "knowingly," the State is not required to prove that a defendant had the *subjective intent* to cause death or serious physical injury.[10]  *See Williams*, 126 S.W.3d at 383-84 (emphasis added).  In other words, it was not necessary for the State to prove that

---

[9] Count II of the substitute information alleged that, "defendant, in violation of Section 571.015, RSMo, committed the felony of armed criminal action . . . in that . . . the defendant committed the felony of Murder 2nd Degree charged in Count 1 . . . and the defendant committed the foregoing felony Murder 2nd Degree by, with and through, the knowing use, assistance and aid of a dangerous instrument."

[10] The definition of armed criminal action does not expressly state a culpable mental state, though one is required, and therefore the mental state for armed criminal action may be established by showing that the person acted "purposely" or "knowingly." Section 562.021.3.

18

Defendant intended to harm B.H. by or through the use of her car. Rather, to support a conviction for armed criminal action, the State was required to show that Defendant knowingly used her vehicle in a manner or under circumstances in which it was readily capable of causing death or serious physical injury. *See id*. at 384.

Here, the evidence presented at trial was sufficient to support Defendant's conviction for armed criminal action. As previously noted, the evidence established that despite being instructed not to drive and to return B.H. to her mother, Defendant knowingly drove her car, while intoxicated, with the child as a passenger, on the highway, at a high rate of speed, onto an exit ramp, without applying the brakes, and striking several objects before crashing into a house. Thus, we find there was sufficient evidence from which the trier of fact could find that Defendant knowingly employed her car as a dangerous instrument by using the vehicle in a manner and under circumstances in which the car was readily capable of causing death or serious physical injury. Point IV is denied.

### Conclusion

For the foregoing reasons, the trial court's judgment is affirmed.

_____
Philip M. Hess, Judge

Sherri B. Sullivan, P.J. and
Mary K. Hoff, J. concur.