

# Missouri Court of Appeals

### Southern District

### Division One

STATE OF MISSOURI, )
)
      Plaintiff-Respondent, )
)
v. ) No. SD33618
) Filed: 10-23-15
JOHN ERIC HOWELL, )
)
      Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable David C. Dally, Circuit Judge

**<u>AFFIRMED</u>**

John Howell (Defendant) was found guilty of driving while intoxicated. *See* § 577.010.[1] On appeal, Defendant argues that the trial court erroneously admitted his blood test results because the officer and paramedic who conducted the blood draw failed to comply with the checklist included in the blood test kit. Because compliance with the checklist is not a prerequisite for admission of the test, we affirm.

On May 12, 2012, Officer Joshua Hanes of the Joplin Police Department attempted to stop Defendant after he turned left against a red light. Defendant initially pulled over into a parking lot, but he then fled in his vehicle. After driving approximately

---

[1] References to statutes are to RSMo Cum. Supp. (2011).

ten blocks, Defendant's vehicle collided with a concrete structure. Because Officer Hanes suspected that Defendant was intoxicated but Defendant refused to perform field sobriety tests, a jail van transported Defendant to a nearby no-refusal DWI checkpoint.[2] At the checkpoint, a search warrant was issued for Defendant's blood.

Officer Shelby Howard then witnessed Defendant's blood being drawn by a paramedic, David Watts, with a blood kit supplied by the Missouri State Highway Patrol (MSHP). The blood kit contained a "checklist" entitled "Procedure for Collection of Blood Sample." This checklist had 15 instructions. Instruction 6 stated: "Retrieve blood sample and gently invert blood tube 20 times." Instruction 7 stated: "Write subject's name on blood tube label." Watts did not recall if he inverted the tube before handing it to Officer Howard but if he had, he would have inverted it "[m]aybe a dozen" times. Watts was unaware of any standard medical practice dictating the number of times that a tube must be inverted. Officer Howard inverted the tube of blood five to seven times to make sure the anticoagulant and preservative mixed with the blood. Officer Howard did not label the actual tube. Instead, he marked the box with the case information and immediately placed the tube inside the box.

Officer Howard described the checklist as a set of general guidelines to help draw blood. Watts testified that the accepted medical practice for drawing blood was to "look at the arm and try to find a suitable site[,]" "place a tourniquet on the patient, check it again to make sure that site is still suitable[,]" and then "go ahead with the blood draw." The test performed on Defendant's sample showed a blood alcohol level of .171 percent.

---

[2] Officer Hanes described a no-refusal checkpoint as a traffic checkpoint in which a prosecutor and judge are present to apply for and issue search warrants if appropriate.

The jury found Defendant guilty, and he was sentenced as a chronic offender to serve 15 years in the Department of Corrections. This appeal followed.

Defendant contends the trial court erred in admitting the blood alcohol test results because "the paramedic and officer failed to comply with the MSHP checklist[.]" We disagree.

The requirements for admission of a blood sample begin in § 577.029, which states in relevant part:

> A licensed physician, registered nurse, or trained medical technician, acting at the request and direction of the law enforcement officer, shall withdraw blood for the purpose of determining the alcohol content of the blood, unless such medical personnel, in his or her good faith medical judgment, believes such procedure would endanger the life or health of the person in custody. Blood may be withdrawn only by such medical personnel, but such restriction shall not apply to the taking of a breath test, a saliva specimen, or a urine specimen. In withdrawing blood for the purpose of determining the alcohol content thereof, only a previously unused and sterile needle and sterile vessel shall be utilized *and the withdrawal shall otherwise be in strict accord with accepted medical practices*.

*Id*. (emphasis added). The next relevant section, § 577.037, states:

> 1. Upon the trial of any person for violation of … section 577.010 … the amount of alcohol in the person's blood at the time of the act alleged as shown by any chemical analysis of the person's blood, breath, saliva or urine is admissible in evidence …. If there was eight-hundredths of one percent or more by weight of alcohol in the person's blood, this shall be prima facie evidence that the person was intoxicated at the time the specimen was taken.
> ….
> 4. A chemical analysis of a person's breath, blood, saliva or urine, in order to give rise to the presumption or to have the effect provided for in subsection 1 of this section, *shall have been performed as provided in sections 577.020 to 577.041 and in accordance with methods and standards approved by the state department of health and senior services*.

*Id*. (emphasis added).

3

The checklist at issue here was not promulgated by the Department of Health. Defendant does not argue that his blood test failed to comply with a method or standard approved by the Department of Health.[3] Rather, Defendant's argument presumes that compliance with the MSHP checklist is the only way to draw blood "in strict accord with accepted medical practices." § 577.029. Few cases have considered the proper administration of a blood test.[4] Defendant cites case law concerning the proper administration of a horizontal gaze nystagmus test as prescribed by the National Highway Traffic Safety Administration Manual. We conclude that case law pertaining to proper administration of a breath test is more applicable to the issue presented here.

The Department of Health has provided a checklist for chemical analysis of breath and requires it to be completed at the time of the breath test. *See* 19 C.S.R. 25-30.011 and 19 C.S.R. 25-30.060. The Department of Health's regulations have priority over

---

[3] The department's regulations contain very few requirements for a proper blood draw:

> (1) Samples of blood, saliva, or urine shall be collected in accordance with the provisions of sections 577.029, and 306.111-306.119, RSMo, and a sufficient volume of sample shall be collected to provide for duplicate testing.
>
> > (A) Blood samples shall be collected in commercially-manufactured blood collection tubes that contain sodium fluoride or an equivalent preservative, as well as potassium oxalate, sodium citrate, or an equivalent anticoagulant.

19 C.S.R. 25-30.070(1)(A). Defendant makes no argument that the blood draw did not comply with any of these requirements. Therefore, Defendant's claim can only succeed if the blood draw was not performed in strict accord with accepted medical practices.

[4] In one case, an emergency room nurse described the standard medical procedures for a blood draw simply as "using a sealed, unused sterile needle, a sterilized syringe, and a sterile collection tube." *State v. Fortner*, 451 S.W.3d 746, 754 (Mo. App. 2014).

4

highway patrol checklists for breath tests. *State v. Crowell*, 560 S.W.2d 889, 891 (Mo. App. 1978). When a breathalyzer checklist exceeds the requirements of the Department of Health, a proper foundation may be laid for admission of test results by showing compliance with the health regulations. *Stuhr v. Dir. of Revenue, State of Mo.*, 766 S.W.2d 446, 449 (Mo. 1989). One court has noted that "use of the check list appears to be only a procedural matter to insure compliance with the rules laid down by the Department of Health, as mandated by the legislature." *State v. Preston*, 585 S.W.2d 569, 571 (Mo. App. 1979). Another court has noted that compliance with some items on the breathalyzer checklist do not affect the validity of the test and therefore do not affect the admissibility. *State v. Barker*, 490 S.W.2d 263, 271-72 (Mo. App. 1973). Based on the testimony in this case, we conclude that the MSHP checklist's instructions to invert the tube and to label the tube also fall into the category of items that do not affect the admissibility of test results, at least under these circumstances.

Officer Howard, who had extensive training, education and experience as part of the DWI unit of the Joplin police, described the checklist as merely a general guideline. He knew the tube needed to be inverted to mix the anticoagulant and the preservative with the blood and believed that could be done by inverting the tube five to seven times. Perhaps more significantly, the paramedic in this case had 17 years of experience as a paramedic, plus five years of experience as an EMT, and was unaware of any standard medical practice dictating the number of times that a tube must be inverted. Given such testimony, Defendant fails to persuade us that accepted medical practices were violated.

Concerning Defendant's argument that the blood tube was not labeled as required by Instruction 7, we note that once again there is no statutory or regulatory basis requiring the tube to be labeled. Presumably, the only reason the label is suggested on

the checklist is to identify the source of the blood. The purpose served by this instruction was satisfied when Officer Howard immediately placed the tube of blood in a box, sealed it, and labeled it with Defendant's case information.

Under these circumstances, we conclude that the trial court did not err by admitting the blood test results in evidence. Defendant's point is denied, and his conviction and sentence is affirmed.

JEFFREY W. BATES, J. – OPINION AUTHOR

DANIEL E. SCOTT, P.J. – CONCUR

MARY W. SHEFFIELD, C.J. – CONCUR